Barry L. JEWELL, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 51A01–9506–CR–192.

Court of Appeals of Indiana.

Aug. 26, 1996.

Transfer Denied Oct. 24, 1996.

John Pinnow, Greenwood, for Appellant.

Pamela Carter, Attorney General, Carol A. Nemeth, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

ROBERTSON, Judge.

Barry L. Jewell broke into his estranged wife's house, beat her lover in the head with a board until he was unconscious, amputated the lover's penis with a knife, and fed the severed penis to the dog. Jewell appeals his convictions, after a jury trial, of Burglary with a deadly weapon resulting in serious bodily injury, a class A felony, and Battery resulting in serious bodily injury, a class C felony. Jewell was sentenced to an aggregate term of 48 years imprisonment. Jewell raises seven issues, which we restate and consolidate into six, none of which constitute reversible error.

## FACTS

This is a direct appeal after the retrial ordered in *Jewell v. State*, 624 N.E.2d 38 (Ind.Ct.App.1993). The facts in the light most favorable to the verdict reveal that, in 1989, Bridget Fisher, who later married Jewell and changed her name to Bridget Jewell, purchased a home on contract in her maiden name from her relatives. Bridget and Jewell lived in the house together on and off before and after they married in 1990. Jewell helped fix the house up, and therefore, had some "sweat equity" in the house.

Jewell and Bridget experienced marital difficulties and dissolution proceedings were initiated. Jewell moved out of the house and Bridget changed the locks so that Jewell could not reenter. At a preliminary hearing in the dissolution proceedings, Bridget's attorney informed Jewell that Bridget wanted a divorce and wanted Jewell to stop coming by the house. Jewell moved into a friend's house, agreeing to pay him $100.00 per month in rent and to split the utility expenses.

Bridget resumed a romantic relationship with her former boyfriend, Chris Jones. Jewell told a friend that he wanted to get Jones in a dark place, hit him over the head with a 2x4 (a board), and cut his "dick" off. Jewell confronted Jones at his place of employment and threatened to kill him if he were to continue to see Bridget. Jewell was observed on numerous occasions watching Bridget's house. Jewell used a shortwave radio to intercept and listen to the phone conversations on Bridget's cordless phone.

At approximately 4:00 a.m. on the morning of June 13, 1991, Jewell gained entry to Bridget's house through the kitchen window after having removed a window screen. Bridget and Jones were inside sleeping. Jewell struck Jones over the head with a 2x4 until he was unconscious, amputated Jones' penis with a knife, and fed the severed penis to the dog. Bridget awoke and witnessed the attack, but she thought she was having a bad dream and went back to sleep. Bridget

described the intruder as the same size and build as Jewell and as wearing a dark ski mask similar to one she had given Jewell. She observed the assailant hit Jones on the head with a board, and stab him in the lower part of his body.

A bloody 2x4 was found at the scene. The sheets on the bed where Bridget and Jones had been sleeping were covered in blood. Bridget discovered that one of her kitchen knives was missing. However, the police did not preserve the sheets or take blood samples and permitted Bridget to dispose of the sheets. A police officer involved explained that the possibility that any of the blood at the crime scene could have come from anyone other than Jones had not been considered.

Jones' severed penis was never found and he underwent reconstructive surgery. His physicians fashioned him a new penis made from tissue and bone taken from his leg. Jones experienced complications and the result was not entirely satisfactory.

At the crime scene, Bridget gave a statement to police in which she identified Jewell as the assailant. Later that morning, however, she waffled on the certainty of her identification, explaining that the assailant had worn a mask and that she had thought that she had been having a dream. However, in the written statement she gave later that morning, she repeatedly stated that she was certain that Jewell had been the assailant.

The police visited the house where Jewell had been staying at approximately 6:00 that morning. One roommate stated that Jewell had not been home when the roommate went to bed at 1:30 a.m. Another roommate stated that he saw Jewell asleep on the couch at 5:30 a.m. The police observed that the hood of Jewell's car was warm and there was no dew on the car, in contrast to the other car parked there. The police told Jewell that they were investigating a complaint that Jones had been hit on the head at Bridget's house. Jewell denied involvement and stated that he had been out cruising around with his buddies the night before. Jewell later told his roommate that the police had accused him of hitting Jones with a board. (The police had not mentioned that Jones had been hit with a board.) Later that day, Jewell went to a house where he had been working. There, he again stated that the police had been at his house investigating a report that a man had been hit on the head with a board.

Jewell admitted to a good friend of his that he had committed the crime. Jewell asked the friend to lie to the police and tell them that he and Jewell had been out drinking beer and riding around the night of the attack. Initially, this friend corroborated Jewell's false alibi with the police, but later recanted and told police that Jewell had told him that he had committed the crime and had enlisted his aid to falsely corroborate his alibi.

The police obtained an arrest warrant and arrested Jewell. At the jail, a detective enlisted the aid of an inmate to collect evidence against Jewell. The detective told the inmate that someone was going to be put in his cell, and that the inmate should report anything he learned from this person. The inmate had not been given any information about the instant crime, and had been instructed not to question Jewell, but only to report what he heard. The inmate overheard Jewell's conversation with another inmate in which Jewell stated that he had committed the crime and described it in detail. In this conversation, Jewell mentioned that there were rubber gloves in a coat pocket. Jewell threatened the inmate not to tell the police what he had heard. The police obtained and executed a search warrant upon the house where Jewell had been staying and found the rubber gloves in the coat pocket. The inmate who reported Jewell's conversation received a favorable disposition of the charges against him.

Additional facts are supplied as necessary.

## DECISION

### I.

*Suppression of Evidence—Arrest Warrant*

Jewell argues the information that the police alleged in the affidavit of probable cause used to obtain the arrest warrant was false, and therefore, the trial court should have suppressed the evidence of the inculpatory statements that he had made after his arrest

to police and others, including the ones made to the inmate at the jail. The affidavit for probable cause stated in pertinent part:

I am a law enforcement officer employed by the Bedford City Police Department. On June 13, 1991, Bridget Jewell reported to me as follows: She had been asleep at her residence during the early morning hours of June 13: she awoke and saw a man wearing a toboggan over his face standing beside her bed. When Bridget Jewell first saw this man, whom she identified as Barry Jewell, her estranged husband, he had a board in his hand. Jewell thought she was dreaming. By the time Jewell realized that she was not dreaming, Barry Jewell appeared to be stabbing Christopher K. Jones in the stomach. Jones had been sleeping beside Bridget until Barry Jewell left the bedroom. After Barry Jewell left the bedroom, Christopher K. Jones began to sit up and get out of bed. Bridget Jewell turned on the lights and observed a great amount of blood. She called the police.

As part of this department's investigation of this matter, I interviewed Christopher K. Jones at Dunn Hospital. Jones advised me that Barry Jewell had threatened him with violence if he (Jones) went out with Bridget Jewell. I observed at the hospital that Jones had sustained head injuries as a result of being hit by the above-described board. Jones' penis had also been cut off during the incident. This happened when Barry Jewell appeared to be stabbing Christopher K. Jones in the stomach.

I credit Bridget Jewell because she is a crime victim, very much afraid, with no apparent reason to lie to the police about the circumstance of the crime. I credit Jones because he is a victim who also has no reason to lie to me.

Jewell asserts that the affidavit is false because Bridget's identification of him had been equivocal, whereas the affidavit repeatedly states that Bridget had identified him as the perpetrator. Jewell points out that in Bridget's written statement she identified the assailant as "this guy." Jewell argues that although Bridget had provided reasons why she suspected that Jewell had been the perpetrator, her identification of him was based on mere speculation or conjecture. Jewell argues further that, absent Bridget's identification, the only evidence set out in the affidavit linking him to the crime was the earlier threat that Jones had reported. Jewell argues that this threat, standing alone, is insufficient to establish probable cause.

Where the defendant makes a substantial showing that a probable cause affidavit was obtained with false statements made knowingly and intentionally, or with reckless disregard for the truth, and that the allegedly false statement is necessary to the finding of probable cause, the sufficiency of the affidavit must be evaluated with the false statements excised. *Utley v. State*, 589 N.E.2d 232, 236 (Ind.1992), *cert. denied*, 506 U.S. 1058, 113 S.Ct. 991, 122 L.Ed.2d 142. If the remaining information in the affidavit is insufficient to establish probable cause, the warrant is void and the evidentiary fruits of the warrant must be suppressed. *Id.* The court on review must examine whether the record reveals such inconsistencies between the information reported to the police and the allegations sworn in the affidavit for probable cause, that the police demonstrated a reckless disregard of the truth in the preparation of the affidavit. *Dolliver v. State*, 598 N.E.2d 525, 529 (Ind.1992). The good faith exception to the exclusionary rule will not save a warrant where the magistrate who issued it was misled by information that the affiant knew was false or would have known was false except for his reckless disregard of the truth. *Id.*

In the present case, the record fails to support Jewell's assertion that the police swore falsely or demonstrated a reckless disregard for the truth in preparing the probable cause affidavit. At 4:26 a.m. on the morning of the attack, Bridget identified Jewell as the perpetrator. She has always stated the man was the same size and build as Jewell. In her written statement given at 5:47 a.m., she repeatedly asserted that she was certain that the assailant had been Jewell. That she may have waffled somewhat, by saying she was not sure of her identification because the man was wearing a mask

and she had thought she was only dreaming, is not dispositive. The affidavit contained those precise circumstances which served to throw some doubt on the accuracy of her identification. We cannot conclude that the affidavit was based on false information or with reckless disregard for the truth such that the judicial officer who issued the warrant could have been misled into issuing a warrant without probable cause. Therefore, the arrest warrant was valid and the evidence obtained after Jewell's arrest was not subject to suppression.

## II.

### Suppression of Evidence—Statements Obtained through a Jail Inmate

Jewell asserts the incriminating statements obtained from his fellow inmate at the jail should have been suppressed, arguing that the inmate was a police operative who was motivated by an implied promise of favorable treatment were he to obtain evidence against Jewell. He argues the State's use of the inmate as an operative was violative of his right to counsel as guaranteed under both the United States and Indiana constitutions. He asserts that, even if this issue were to be decided adversely to him under the United States constitution, we should interpret it as violative of the greater protections afforded to the right of counsel guaranteed under the Indiana Constitution.

■ A criminal defendant's right to counsel is violated when the government intentionally creates a situation likely to induce that defendant to make an incriminating statement in the absence of counsel. *Rutledge v. State*, 525 N.E.2d 326, 327 (Ind.1988). However, there is no constitutional violation where a passive listener merely collects, but does not induce, the incriminating statements. *Id.* at 328. In *Hobbs v. State*, 548 N.E.2d 164 (Ind.1990), our supreme court held there was no constitutional violation where the police simply asked an inmate to write down information about a particular case if he were to hear about it, but there was no evidence that the inmate was induced or paid to collect the information. *Id.* at 167.

■ In the present case, the inmate testified that he did not ask Jewell any questions but simply overheard him make the incriminating statements to another inmate. Thus, the inmate was merely a passive listener who collected, but did not induce, the incriminating statements made by Jewell. We do not believe that either the United States or Indiana Constitutions requires that Jewell's counsel be present under these circumstances. Therefore, the evidence provided by the inmate was not subject to suppression and we find no error.

## III.

### Mistrial—Evidentiary Harpoon

Jewell obtained a pre-trial order in limine which was to exclude evidence of his post-*Miranda* silence. Nevertheless, the State questioned one of the police officers regarding statements made by Jewell after his arrest. The police officer answered that Jewell had asked about the evidence against him and had related his alibi that he had been out driving around with somebody in another county at the time the crime had been committed. The police officer related further that when he asked Jewell if he wanted to make a written statement, Jewell declined but stated that he would tell his side of the story in court. Jewell moved for a mistrial asserting that the police officer's statement that Jewell had declined to make a written statement impermissibly referred to his post-*Miranda* silence. The trial court denied the motion for a mistrial and asked whether Jewell wished to have the jury admonished. Jewell declined on the basis that an admonishment would serve only to draw more attention to the subject. On appeal, Jewell argues that the police officer's statement was an "evidentiary harpoon" for which the granting of a mistrial was the only sufficient remedy and that the trial court's denial of his motion for a mistrial was reversible error.

■ Jewell correctly asserts that, in general, the prosecution is not permitted to introduce evidence of a defendant's exercise of his constitutional rights in order to impeach the defendant or invite the jury to infer the defendant's guilt from the exercise of those rights. *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976)

(Use of defendant's post-*Miranda* silence); *McCollum v. State*, 582 N.E.2d 804, 813 (Ind. 1991). The improper use of the defendant's assertion of his constitutional rights may be harmless if the reviewing court, after assessing the record as a whole to determine the probable impact of the improper evidence on the jury, concludes beyond a reasonable doubt that the error did not influence the verdict. *Bieghler v. State* (1985), Ind., 481 N.E.2d 78, 92, *cert. denied*, 475 U.S. 1031, 106 S.Ct. 1241, 89 L.Ed.2d 349. Among the factors to be addressed in this analysis are 1) the use to which the prosecution puts the post-*Miranda* silence; 2) who elected to pursue the line of questioning; 3) the quantum of other evidence of guilt; 4) the intensity and frequency of the reference; and 5) the availability to the trial judge of an opportunity to grant a motion for mistrial or to give curative instructions. *Id.*

 A mistrial is an extreme remedy warranted only when no other curative measure will rectify the situation, and whether to grant a motion for a mistrial is a matter committed to the sound discretion of the trial court. *James v. State*, 613 N.E.2d 15, 22 (Ind.1993). When determining whether a mistrial is warranted, the court on review must consider whether the defendant was placed in a position of grave peril to which he should not have been subjected. *Id.* The gravity of the peril is determined by the probable persuasive effect on the jury's decision. *Id.* A timely and accurate admonition is presumed to cure any error in the admission of evidence. *Id.* The determination of whether to grant a mistrial is within the trial court's discretion; and great deference is accorded the trial court on appeal, as it is in the best position to gauge the circumstances and the probable impact on the jury. *Schlomer v. State*, 580 N.E.2d 950, 955 (Ind. 1991).

 An evidentiary harpoon is the placing of inadmissible evidence before the jury with the deliberate purpose of prejudicing the jurors against the defendant. *Evans v. State*, 643 N.E.2d 877, 879 (Ind.1994). Thus, in order to obtain reversal, the defendant must show that 1) the prosecution acted deliberately to prejudice the jury and 2) the evidence was inadmissible. *Id.* In order to obtain reversal, the defendant need not show

that an evidentiary harpoon injured him to the extent that he would not have been found guilty but for the harpooning. *Garcia v. State*, 509 N.E.2d 888, 890 (Ind.Ct.App.1987). The defendant need only show that he was placed in a position of grave peril to which he should not have been subjected. *Id.*

 In the present case, the line of questioning was proper and the police officer's response was not a direct comment on Jewell's post-*Miranda* silence. The police officer did not testify that Jewell had exercised his right to remain silent. The police officer testified that Jewell had spoken freely to the police after his arrest, but simply declined to put his statements down in writing. Moreover, the quantum of the other evidence of Jewell's guilt was substantial. Jewell had made several incriminating statements before and after the crime, some in which he had actually admitted his guilt. Jewell had been stalking his estranged wife. The State did not take undue advantage of the challenged evidence. Jewell's refusal to make a written statement was only briefly mentioned and not pursued further. Finally, the trial court offered to admonish the jury. Under these circumstances, we find neither the insertion of an evidentiary harpoon nor reversible *Doyle* error.

## IV.

### *Refusal of Tendered Instructions*

#### A.

Jewell sought to take advantage of the fact that the police had not preserved the bloody sheets or performed further forensic tests on evidence at crime scene. Jewell argued vigorously to the jury the possibility that, had the evidence been preserved and tested, it may have exonerated him by revealing that someone other than Jewell had committed the crime. For example, Jewell argues that blood tests may have revealed that someone else's blood, besides his or Jones', had been spilled at the crime scene. In support of this theory, Jewell tendered the following jury instruction which the trial court refused:

> If you find that the State has intentionally, knowingly, recklessly, or negligently lost, destroyed, or failed to preserve evidence whose contents or quality are important to the issues of this case, then you should

weigh the explanation if any given for the loss or unavailability of the evidence. If you find that such explanation is inadequate, then you may draw an inference unfavorable to the State, which in itself may create a reasonable doubt as to the Defendant's guilt.

When this instruction was refused, Jewell tendered an alternative instruction which deleted the term "negligently." This variation was refused as well. Jewell asserts that the refusal of this instruction denied him his right to have the jury instructed on any theory or defense having some foundation in the evidence, citing *Toops v. State*, 643 N.E.2d 387, 389 (Ind.Ct.App.1994) (Trial court erred in refusing instruction on the necessity defense). *See also Strong v. State*, 591 N.E.2d 1048, 1050 (Ind.Ct.App.1992) (Trial court erred in refusing instruction on entrapment defense), *trans. denied.*

■■■ When reviewing the refusal of a tendered jury instruction, the court on review must determine whether the tendered instruction correctly states the law, whether there was evidence in the record to support the giving of the instruction, and whether substance of tendered instruction is covered by other instructions. *Evans v. State*, 571 N.E.2d 1231, 1236 (Ind.1991). Before a defendant is entitled to reversal, he must affirmatively show that there was error prejudicial to his substantial rights. *Tyson v. State*, 619 N.E.2d 276, 300 (Ind.Ct.App.1993), *trans. denied, cert. denied*, 510 U.S. 1176, 114 S.Ct. 1216, 127 L.Ed.2d 562. The giving or refusing of jury instructions is a matter largely entrusted to the sound discretion of the trial court. *Id.*, 619 N.E.2d at 293.

■■ The failure to preserve potentially useful evidence may constitute a denial of due process and require reversal where the criminal defendant can show bad faith on the part of the police. *Bivins v. State*, 642 N.E.2d 928, 943 (Ind.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 783, 133 L.Ed.2d 734. Indiana courts have long required a showing of bad faith on the part of the police in evaluating whether the failure to preserve evidence constitutes a denial of due process. *Id.*; *McGowan v. State*, 599 N.E.2d 589, 594 (Ind.1992). Jewell argues that, even if the refusal of his instructions did not violate his

federal right to due process, we should find that it was violative of the greater due process protection provided under Indiana's constitution.

At the outset, we note that the instruction tendered by Jewell does not represent a particular affirmative defense as did the instructions tendered in *Toops*, 643 N.E.2d 387, and *Strong*, 591 N.E.2d 1048. Instead, the instruction merely invites the jury to find reasonable doubt based on the failure of the police to preserve the evidence in question.

■■ Moreover, Jewell has never seriously argued that the police exercised bad faith in failing to preserve evidence from the crime scene. As noted above, the police had explained that they had not considered the possibility that the blood of anyone else besides Jones could have been left at the crime scene. This conclusion is reasonable. The cowardly attack upon Jones took place while he was sleeping. While Jones awoke and struggled with his attacker, there is little reason to expect that the unarmed Jones, soon beaten unconscious with a board, could have drawn blood from his assailant. Therefore, it does not follow logically that the failure of the police to preserve evidence from the crime scene would give rise to an inference adverse to the State. Further preservation and testing of evidence from the crime scene may well have produced additional evidence against Jewell. Thus, Jewell's instruction is not supported by evidence and was properly refused. *See Nettles v. State*, 565 N.E.2d 1064, 1069 (Ind.1991) (Trial court properly refused instruction that jury could infer that evidence destroyed or permitted to deteriorate by the State would have been unfavorable to the State and beneficial to the accused); *Greene v. State*, 515 N.E.2d 1376, 1382 (Ind.1987) (Trial court properly refused instruction that jury could presume that videotapes recorded over by the State would have provided evidence against its interest).

Under the circumstances present in this case, Jewell's due process rights, whether derived from the United States or the Indiana Constitution, have not been compromised by the trial court's refusal of the tendered instruction that the jury could draw an inference adverse to the State from its de-

struction of or failure to preserve evidence. Therefore, we find no error.

## B.

Next, Jewell argues the trial court erred by refusing his tendered instruction on the offense of burglary regarding the "concurrence of conduct and intent," that is, that the jury need find that when Jewell broke in and entered the house, he did so with the intent of committing the crime of battery with a deadly weapon therein. Jewell's instruction informed the jury that the State could not meet its burden by proving that he had formed the intent to commit a felony after he had entered the house. The State concedes that Jewell's instruction correctly stated the law.

■ However, the trial court gave the following instruction:

To convict the defendant of burglary as alleged in Count 1 of the relevant Information the State must have approved [sic] each of the following elements: The defendant 1; knowingly or intentionally, 2; did break and enter, 3; the dwelling of Bridget Jewell, 4; *with the intent to commit a felony in it, to-wit: Battery with a deadly weapon,* and 5; and the burglary resulted in serious bodily injury to Christopher K. Jones. To convict the defendant of burglary as charged in Count 1 of the relevant Information *you also must find that at the time of the alleged breaking and entering of the dwelling of Bridget Jewell the defendant had an intent to commit a felony* in the dwelling of Bridget Jewell. If the State failed to prove each of these elements beyond a reasonable doubt you should find the defendant not guilty. If the State did prove each of these elements beyond a reasonable doubt, you should find the defendant guilty of Burglary, a Class A felony.

(Emphasis added). This instruction adequately informed the jury regarding the requirement that they find a "concurrence of conduct and intent." Therefore, the substance of Jewell's tendered instruction was covered by the trial court's instruction, and we find no error.

## V.

### *Sufficiency*

#### A.

Jewell attacks the sufficiency of evidence supporting his conviction of Burglary, which is defined as:

A person who breaks and enters the building or structure *of another person,* with intent to commit a felony in it, commits burglary.

Ind.Code 35–43–2–1 (Emphasis added). Jewell argues he was improperly convicted of breaking into his own house.

■ When reviewing the sufficiency of the evidence, we neither reweigh the evidence nor judge the credibility of witnesses. *Landress v. State,* 600 N.E.2d 938, 940 (Ind. 1992). Rather, we examine only the evidence most favorable to the judgment, along with all reasonable inferences to be drawn therefrom, and if there is substantial evidence of probative value to support the conviction, it will not be set aside. *Id.* It is for the fact-finder to resolve conflicts in the evidence and determine which witnesses to believe. *Marshall v. State,* 621 N.E.2d 308, 320 (Ind.1993).

■ The Burglary statute's requirement that the dwelling be that "of another person" is satisfied if the evidence demonstrates that the entry was unauthorized. *Ellyson v. State,* 603 N.E.2d 1369, 1373 (Ind.Ct.App. 1992). In *Ellyson,* we held a husband was properly convicted of burglary for breaking into the house in which he and his estranged wife had lived previously with the intent of raping his wife. We noted that dissolution proceedings had been initiated and that wife alone controlled access to the home. *Id.* at 1372–73. We upheld the husband's burglary conviction even though he may have had a right to possession of the house co-equal with his wife at the time of the breaking and entering. *Id.* at 1373.

■ In the present case, Bridget had purchased the house in her own name before the marriage. When she and Jewell experienced marital difficulties, Jewell moved out and Bridget changed the locks to prevent Jewell from reentering the house. Bridget alone controlled access to the house. Jewell entered the house at 4:00 a.m. through the kitchen window after having removed the

screen. The evidence supports the conclusion that the entry was unauthorized; and, therefore, we find no error.

### B.

■ Next, Jewell argues there was insufficient evidence that he had entered the house with the intent to commit a felony battery therein. That a burglary defendant entered the structure with the intent to commit the felony charged therein is a matter that the jury can infer from the surrounding circumstances. *Gee v. State*, 526 N.E.2d 1152, 1154 (Ind.1988). Although the fact of breaking and entering is not itself sufficient to prove the entry was made with the intent to commit the felony, such intent may be inferred from the subsequent conduct of the defendant inside the premises. *Eveler v. State*, 524 N.E.2d 9, 11 (Ind.1988).

■ In the present case, before the date of the crime, Jewell had expressed his intention to get Jones in a dark place, hit him with a 2x4, and cut off his penis. Jewell did precisely that after breaking into his estranged wife's house. The jury could properly infer that Jewell broke into the house with the intent to commit the felony battery therein as charged. Therefore, we find no error.

### VI.

#### *Double Jeopardy*

Jewell argues his sentencing on both convictions of Burglary and Battery violate double jeopardy. The two counts were charged by information which read in pertinent part as follows:

#### COUNT I

Jewell did break and enter ...; with the intent to commit a felony therein, towit: Battery With a Deadly Weapon; said act resulting in serious bodily injury to ·Christopher K. Jones, to-wit: the removal of his penis.

#### COUNT V

Jewell knowingly or intentionally touched Christopher K. Jones in a rude, angry or insolent manner by striking him on the head; said striking resulting in serious bodily injury, to-wit: unconsciousness ...

■ Convictions of both Burglary and Battery do not violate double jeopardy because each crime requires proof of an additional fact which the other does not; Burglary requires proof of breaking and entering while Battery requires proof of a touching.. *Lyles v. State*, 576 N.E.2d 1344, 1352 (Ind.Ct. App.1991) (Application of the test prescribed by *Blockburger v. United States*, (1932), 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306), *trans. denied.* Additionally, Indiana's double jeopardy analysis requires the court on review to look to the manner in which the offenses are charged. *Buie v. State*, 633 N.E.2d 250, 260 (Ind.1994). If the State is not required to prove any additional facts to obtain a second conviction, double jeopardy will be violated. *Id.* at 260–261. The imposition of two sentences for the same injurious consequences inflicted by the defendant's singular act will violate double jeopardy. *Hansford v. State*, 490 N.E.2d 1083, 1089 (Ind.1986).

In the present case, the Burglary charge involved the amputation of Jones' penis and the Battery charged involved the beating of Jones' head with a board. Thus, there is no double jeopardy violation here, and we find no error.

Judgment affirmed.

NAJAM and FRIEDLANDER, JJ., concur.