Kevin L. BLAIR, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 87A01–0701–CR–16.

Court of Appeals of Indiana.

Dec. 12, 2007.

C. Richard Martin, Martin & Martin, Attorneys at Law, P.C., Boonville, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Scott L. Barnhart, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Kevin L. Blair appeals his convictions for child molesting,[1] as a class A felony; sexual misconduct with a minor,[2] as a class B felony; and child molesting, as a class C felony.

We affirm.

### ISSUES

1. Whether the trial court erred in denying Blair's motion for discharge pursuant to Indiana Criminal Rule 4(C).

2. Whether the trial court abused its discretion in excluding evidence and admitting testimony.

---

1. Ind.Code § 35–42–4–3.

2. I.C. § 35–42–4–9.

1. Whether the trial court erred in refusing tendered jury instructions.

## FACTS

T.H. was born on August 13, 1987. When T.H. was nine years-old, Blair moved into the Rockville residence that T.H. shared with her mother, Dawn; grandfather; grandmother; and great-grandmother, H. Joyce Boswell. Blair, Dawn and T.H. later relocated to Clinton, where Boswell moved in with them. Blair and Dawn were married in 1997. Approximately one year later, the family, including Boswell and T.H.'s half-brother—born in 1998—relocated to Lynnville.

When T.H. was eleven years-old, she came home from school; Blair, who was unemployed at the time, was watching television in the living room. T.H. went into Blair and Dawn's bedroom to watch cartoons; Blair "came in, pushed [T.H.] down, pulled [T.H.'s] pants down and raped [her]," by "put[ting] his penis in [her] vagina." (Tr. 36). Blair told T.H. not to tell Dawn, threatening that T.H. "would be taken away." (Tr. 37).

Subsequently, Blair raped T.H. on a weekly basis and continued doing so "[u]ntil a few weeks before he moved out" of the home in October of 2002. (Tr. 38). Blair also would touch T.H.'s breasts and vagina with "his mouth and fingers" and would make T.H. touch his penis with her "[m]outh, hands, [and] vagina...." (Tr. 38). When T.H. was fifteen years-old, Blair "asked [her] to put a flashlight in his butt and give him a 'hand job' at the same time"; T.H. complied. (Tr. 40).

In the fall of 2002, T.H. reported to a caseworker from Child Protective Services that Blair had been molesting her. On December 2, 2004, the State charged Blair with Count 1, child molesting, as a class A felony; Count 2, sexual misconduct with a minor, as a class B felony; and Count 3, child molesting, as a class C felony. Blair was arrested on December 14, 2004.

On December 20, 2004, the State filed a request for production. On December 27, 2004, Blair filed his reply and request for production.

On February 28, 2005, the parties agreed to a trial date of August 2, 2005. On July 20, 2005, the State filed a motion to continue the jury trial, to which Blair objected. On July 21, 2005, the trial court granted the State's motion and set a "progress hearing to reschedule the jury trial" for August 8, 2005. (App.104). On August 8, 2005, the trial court, "[b]y agreement of the parties," set the jury trial for November 29, 2005. (App.4).

On November 18, 2005, eleven days prior to the date set for trial, Blair filed a motion to exclude evidence and for a continuance of the trial to be chargeable to the State. In his motion, Blair acknowledged that by July 20, 2005, the State had produced certain documents in response to Blair's December 27, 2004 request for production. Blair, however, asserted that "[o]n November 17, 2005, a mere twelve days before the trial is scheduled to begin, the State ... produced an additional 189 pages of documents...." (App.118). Blair therefore sought to exclude the documents from the evidence or, in the alternative, a continuance of the trial, to be charged to the State.

The trial court held a hearing on Blair's motion on November 21, 2005, during which it heard counsels' arguments. The State agreed to exclude the documents from evidence but objected to a continuance of the trial date. The trial court reset the matter for another hearing on November 23, 2005, to give Blair an opportunity to review the documents produced by the State.

During the hearing on November 23, 2005, Blair again argued for a continuance of the trial as he had received approximately 150 more pages of documents on November 22, 2005. The State argued that any continuance should not be charged to it as it had just received those documents on or about November 21, 2005, and provided them to Blair the next day. Furthermore, the State argued that it had no custody or control over the documents, as they had been in the possession of another agency, and again agreed to exclude the documents from evidence. The trial court granted the continuance and vacated the trial set for November 29, 2005. According to the chronological case summary (the "CCS"), on November 28, 2005, the trial court, "[b]y agreement of the parties," set the trial for March 14, 2006. (App.6). The CCS does not reflect that Blair objected to the new trial date.

On January 20, 2006, Blair filed a motion for discharge pursuant to Criminal Rule 4(C). Blair also filed a motion to extend the time to complete discovery. The trial court held a hearing on Blair's motion for discharge on March 6, 2006.

On March 14, 2006, Blair sought, and was granted a continuance of the trial to pursue an interlocutory appeal. This court declined to accept jurisdiction of the appeal on or about May 5, 2006. On May 15, 2006, the trial court set the jury trial for August 15, 2006. According to the CCS, on July 3, 2006, the trial court, "[b]y agreement of the parties," reset the jury trial for October 10, 2006. (App.10).

The jury trial commenced on October 10, 2006, after which the jury found Blair guilty as charged. On November 6, 2006, the trial court sentenced Blair to twenty-five years on Count 1; ten years on Count 2; and four years on Count 3. The trial court ordered that the sentences be served concurrently.

Additional facts will be provided as necessary.

## DECISION

### 1. *Discharge*

Blair asserts that the trial court erred in denying his motion for discharge pursuant to Criminal Rule 4(C). Specifically, Blair argues that the time from his arrest—December 14, 2004—until the first continued trial date—November 29, 2005; and the time from the first continued trial date—November 29, 2005—until the second continued trial date—March 14, 2006—should be charged to the State.

 The Sixth Amendment to the United States Constitution and Article 1, Section 12 of the Indiana Constitution guarantee the right to a speedy trial. *Alter v. State*, 860 N.E.2d 874, 876 (Ind.Ct.App. 2007). As to the date by which a trial must be held, Criminal Rule 4(C) provides, in relevant part, as follows:

No person shall be held on recognizance or otherwise to answer a criminal charge for a period in aggregate embracing more than one year from the date the criminal charge against such defendant is filed, or from the date of his arrest on such charge, whichever is later; except where a continuance was had on his motion, or the delay was caused by his act, or where there was not sufficient time to try him during such period because of congestion of the court calendar[.]

 It is the State's duty to bring a defendant to trial within one year of being charged or arrested. *Alter*, 860 N.E.2d at 877. "However, when a trial date is set beyond the one-year limit provided under Criminal Rule 4(C), the defendant must file a timely objection to the trial date or waive his right to a speedy trial." *Mar-*

*shall v. State,* 759 N.E.2d 665, 668 (Ind.Ct. App.2001).

■ Furthermore, when a defendant seeks or acquiesces in a delay, which results in a later trial date, the delay extends the time limitation by the length of the delay. *Id.* "Whether a particular delay in bringing a defendant to trial violates the speedy trial guarantee is a determination that 'largely depends on the specific circumstances of the case.'" *Id.* (quoting *Wheeler v. State,* 662 N.E.2d 192, 193 (Ind. Ct.App.1996)).

### a. *The State's motion for continuance*

■ Blair contends that the time from his arrest—December 14, 2004—until the first continued trial date—November 29, 2005, should be charged to the State. We agree that part—but not all—of this time is chargeable to the State.

As stated above, Blair was arrested on December 14, 2004. Subsequently, the parties agreed to a trial date of August 2, 2005. The State, however, filed a motion for a continuance of the trial on July 20, 2005, which the trial court granted. The CCS reflects that on August 8, 2005, the trial court, "[b]y agreement of the parties," set the trial for November 29, 2005. Once again, the CCS does not show that Blair objected to the new trial date.

The time from the arrest until the hearing on August 8, 2005—237 days—should be charged to the State. On August 8, 2005, however, Blair apparently agreed and/or acquiesced to the setting of the new trial date. Accordingly, the length of time from August 8, 2005, until the new trial date of November 29, 2005—113 days—extended the time by which the State was required to bring Blair to trial.[3] *Marshall,* 759 N.E.2d at 668.

### b. *Blair's motion for a continuance*

■ Blair further contends that the time from the first continued trial date—November 29, 2005—until the second continued trial date—March 14, 2006—should be charged to the State. We disagree.

On December 27, 2004, Blair filed a request for production pursuant to Indiana Trial Rule 34, which requires production within thirty days of service. Among the items requested, Blair sought production of any and all items relating to a police report made by T.H. against Eugene W. Moore.

On November 18, 2005, Blair filed a motion to continue the trial. Blair argued that the State's production of "an additional 189 pages of documents in response to [Blair]'s Request for Production of Information," filed nearly one year prior, "severely prejudice[d] [Blair]'s ability and his counsel's ability to adequately prepare for trial in this matter." (App.118). Blair further sought to have any delay caused by the continuance charged to the State.

Following a hearing, the trial court continued the trial to March 14, 2006. Citing *Marshall,* Blair argues that the trial court erred in not charging the State for this delay.

In *Marshall,* we held that the delay in bringing Marshall to trial should not be charged to Marshall where "the State failed to comply with a discovery request." 759 N.E.2d at 669. In *Marshall,* however, the defendant "actively pursued the evidence" and was forced to seek repeated continuances due to the State's failure to provide discovery. *Id.* Furthermore, in *Marshall,* the State repeatedly failed to comply with discovery requests.

---

**3.** We note that even if this time were charged to the State, the trial date of November 29, 2005, would fall within the one-year limit, as it fell 350 days from the date of Blair's arrest.

In this case, Blair did not seek a continuance until nearly one year following his request for production and eleven days prior to the trial. Moreover, in that time, Blair never sought to compel discovery from the State pursuant to Trial Rule 37 even though Blair was aware that items subsequently produced by the State existed. Blair also failed to show that he was prejudiced by the delay in receiving the documents, which have not been shown to be relevant or exculpatory. Moreover, there is no indication that the State was negligent in providing discovery; in fact, the State had timely provided Blair with all of the evidence it intended to use at trial prior to Blair filing his motion on November 18, 2005. *See C.L.Y. v. State,* 816 N.E.2d 894, 902 (Ind.Ct.App.2004), *trans. denied.* We therefore conclude that any delay due to discovery production was attributable to Blair.

█ Furthermore, Blair failed to make a timely objection when, on November 28, 2005, the trial court re-set the trial for March 14, 2006; in fact, Blair waited until January 20, 2006, before filing a motion for discharge. Thus, Blair has waived his rights under Criminal Rule 4(C). *See Hood v. State,* 561 N.E.2d 494, 496 (Ind. 1990) (holding that failure "to object at the earliest opportunity" to a trial date which is beyond the time period allowed waives the issue). Accordingly, we find no error in denying Blair's motion for discharge.

2. *Evidentiary Issues*

Blair contends two evidentiary issues. Blair argues that the trial court erroneously excluded evidence that T.H. made prior accusations that another person had molested her. Blair also argues that the trial court erroneously admitted testimony regarding prior bad acts.

We note that the admission or exclusion of evidence is within the sound discretion of the trial court, and we will reverse the trial court's determination only for an abuse of that discretion. An abuse of discretion occurs when a decision is clearly against the logic and effect of the facts and circumstances before the trial court. In reviewing the admissibility of evidence, we consider only the evidence in favor of the trial court's ruling and any unrefuted evidence in the appellant's favor. As a rule, errors in the admission or exclusion of evidence are to be disregarded as harmless unless they affect the substantial rights of a party. In determining whether an evidentiary ruling affected a party's substantial rights, we assess the probable impact of the evidence on the trier of fact.

*Redding v. State,* 844 N.E.2d 1067, 1069 (Ind.Ct.App.2006) (internal citations omitted).

a. *Exclusion of evidence*

█ Blair asserts that the trial court erred in excluding evidence of false statements made by T.H. that Eugene Moore had raped her in October of 2002. We disagree.

The facts regarding T.H.'s accusations follow. In the fall of 2002, T.H. accused Eugene Moore, the stepfather of a friend, S.G., of molesting her while she slept in S.G.'s bedroom. T.H. told S.G. about the incident shortly thereafter. Subsequently, S.G.'s sister, T.G., also accused Moore of molesting her.

While investigating T.G.'s case, Detective Jerry Abshire of the Boonville Police Department became aware of T.H.'s allegations against Moore. Detective Abshire forwarded the information regarding the alleged molestation by Moore to Detective Jerry Kemp of the Warrick County Sheriff's Department, who was investigating T.H.'s allegations against Blair.

As part of his investigation, Detective Kemp interviewed S.G. on May 2, 2003. S.G. stated that she did not believe Moore had molested T.H. because she was "a light sleeper and ... was less than 5 feet away" from where T.H. slept. (Pre–Trial Ex. 1, p. 2). S.G. also claimed that she would have heard Moore come into the room because "every time you take a step[, the stairs] squeak pretty loud...." *Id.* at 3. S.G. also stated that she had "no reason to believe [T.H.] because" she also had accused Blair "of doing the exact same thing to her and she just keeps on accusing this person and that person...." *Id.* at 4.

On October 31, 2005, the State filed a motion in limine, seeking "to exclude all testimony and evidence regarding any past accusations made by T.H." (App.105). On March 14, 2006, the trial court held a hearing on the State's motion in limine.

During the hearing, S.G. testified that T.H. had told her that someone had "mess[ed] with her" on two different occasions while T.H. slept at S.G.'s home. (March 14, 2006 Hrg. Tr. 6). S.G. also testified that regarding her previous statement that she was a light sleeper, she "realize[d] that it obviously was not the truth" because Moore had molested T.G. while S.G. slept in the same room. *Id.* at 8. S.G. further testified that she no longer lived in the house where Moore allegedly molested T.H. and could not remember whether the stairs creaked. Finally, S.G. testified that regarding her statement that she "kn[e]w that nothing happened" between Moore and T.H., she did not "believe it anymore" because T.H. "wouldn't have been upset over nothing." *Id.* at 13.

The trial court found no evidence that T.H. "ever recanted or admitted to making a false statement" and did not find T.H.'s statements to be demonstrably false. *Id.* at 40. Accordingly, the trial court granted the State's motion in limine and directed Blair "not to mention to the jury or offer evidence in this case concerning prior accusations against other individuals" by T.H. *Id.*

During the trial, Blair made an offer to prove regarding T.H.'s prior accusations. The trial court affirmed its original ruling and excluded the evidence.

Regarding the admission of evidence of prior sexual conduct, Indiana Evidence Rule 412 provides:

(a) In a prosecution for a sex crime, evidence of the past sexual conduct of a victim or witness may not be admitted, except:

(1) evidence of the victim's or of a witness's past sexual conduct with the defendant;

(2) evidence which shows that some person other than the defendant committed the act upon which the prosecution is founded;

(3) evidence that the victim's pregnancy at the time of trial was not caused by the defendant; or

(4) evidence of conviction for a crime to impeach under Rule 609.

■ Evidence Rule 412, however, "is only designed to exclude evidence of a complaining witness's prior sexual conduct, and evidence of prior false accusations of rape made by a complaining witness does not constitute prior sexual conduct for rape shield purposes: such evidence is more properly understood as verbal conduct." *Fugett v. State,* 812 N.E.2d 846, 849 (Ind.Ct.App.2004). Thus, Indiana common law permits evidence of a prior false accusation of rape. *Id.*

■ Evidence of prior false accusations may be admitted only if 1) the complaining witness admits that she had made a prior false accusation of rape; or 2) the accusa-

tion is demonstrably false. *Id.* "Prior accusations are demonstrably false where the victim has admitted the falsity of the charges or they have been disproved." *Id.*

Here, there is no evidence that T.H. admitted to making a prior false accusation of rape against Moore. Furthermore, there is no evidence that T.H. made contrary statements about whether she was molested by Moore. Rather, S.G.'s testimony merely invites an inference that T.H.'s accusation may have been false. We therefore find no error in excluding the evidence.

### b. *Admission of testimony*

▆▆▆▆ Blair argues that the trial court erred in admitting evidence that T.H.'s mother found Blair kissing T.H. in Blair's bedroom. Specifically, Blair argues that the testimony was an impermissible reference under Indiana Evidence Rule 404(b). The State argues that the testimony was admissible as it referred to "part of the charged criminal act alleged in Count III of the information." State's Br. 21.

The State charged Blair as follows:

[O]n one or more occasions between August 31, 1998 and August 12, 2002[,] . . . [Blair] did perform or submit to fondling and/or touching with [T.H.], a child under the age of fourteen years, to-wit: age eleven (11) to fourteen (14) years of age, with the intent to arouse or satisfy the sexual desires of the child or defendant, contrary to the form of the statutes in such cases made and provided by I.C. 35–42–4–3(b) . . . .

(App.17).

Indiana Code section 35–42–4–3(b) provides:

A person who, with a child under fourteen (14) years of age, performs or sub-

mits to any fondling or touching, of either the child or the older person, with intent to arouse or to satisfy the sexual desires of either the child or the older person, commits child molesting, a Class C felony.

During the trial, T.H. testified that when she was "14" years-old (Tr. 43), her mother arrived home unexpectedly and saw Blair "holding" and "kissing" T.H. on the mouth. (Tr. 44). T.H. testified that she and Blair were lying on Blair's bed, and Blair had his arms "wrapped" around T.H. *Id.* Both Blair and T.H. were fully clothed. T.H. testified that Blair told T.H.'s mother that he was demonstrating "how boys kiss." (Tr. 45).

Blair objected to T.H.'s testimony as impermissible references under Indiana Evidence Rule 404(b). The State argued that the testimony was admissible as it referred to charged conduct, namely "part of the touching that's alleged in part of the crimes." (Tr. 44).

Here, the record indicates that T.H. testified that she was fourteen years-old when her mother caught Blair kissing her. Therefore, contrary to the State's assertion, T.H.'s testimony was not admissible as evidence of the charged conduct because T.H. was not "a child under fourteen (14) years of age" when Blair was caught kissing her. *See* I.C. § 35–42–4–3(b).[4]

▆▆▆ Nonetheless, any error in admitting T.H.'s testimony was harmless as Dawn testified—without objection—that she observed Blair and T.H. "laying [sic] on the bed, kissing." (Tr. 114). Furthermore, T.H. testified that Blair's inappropriate sexual conduct with her had been happening for a number of years before her mother caught him kissing her on the

---

**4.** We note that T.H.'s testimony that Blair also touched her breasts and vagina supports his conviction for child molesting, as a class C felony.

bed. Thus, T.H.'s testimony was cumulative and any error in the admission of it was harmless. *See Hicks v. State,* 690 N.E.2d 215, 223 (Ind.1997).

### 3. *Jury Instructions*

■■■■■■ Blair asserts that the trial court erred in refusing three of his tendered jury instructions.

> The trial court has broad discretion in the manner of instructing the jury and we review its decision thereon only for an abuse of that discretion. We review the refusal of a tendered instruction by examining whether the tendered instruction correctly states the law, whether there is evidence in the record to support giving the instruction, and whether the substance of the tendered instruction is covered by other given instructions. Jury instructions are to be considered as a whole and in reference to each other. The ruling of the trial court will not be reversed unless the instructions, when taken as a whole, misstate the law or mislead the jury. Before a defendant is entitled to a reversal, he must affirmatively show that the erroneous instruction prejudiced his substantial rights.

* * *

> The purpose of an instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict. In instructing a jury, the trial court has a statutory duty to state to the jury all matters of law that are necessary for its information in giving its verdict.

*Snell v. State,* 866 N.E.2d 392, 395–96 (Ind.Ct.App.2007) (internal citations omitted).

### a. *Tendered Instruction No. 1*

■■■■ Blair contends that the trial court erred in refusing the following tendered instruction:

> You have heard testimony in this case concerning the State's failure to investigate and interview certain witnesses. The failure of the State to so investigate and conduct these witness interviews is relevant to the issues presented by this case. The lack of investigation or failure to interview certain witnesses, and the resulting nonexistence of a certain type of evidence, may certainly be considered by you as relevant evidence during your deliberations.
>
> Indeed, from the fact that the State did fail to investigate and interview certain witnesses or follow certain police procedures, you may draw an adverse inference against the State, which may raise, in your minds, a reasonable doubt as to the accused's guilt. The fact that something was not done which could easily have been done may, quite obviously, be considered by you in connection with making your judgment, for when potential evidence is not pursued by the party in the best position to make such an investigation, one may infer that the potential results of that investigation would be unfavorable to the party's cause.
>
> You may consider testimony that the State or its agents either failed to preserve or destroyed or discarded relevant evidence as affirmative evidence of the weakness of the State's case. This testimony, alone or in combination with other matters, may create in your mind a reasonable doubt entitling the [a]ccused to an acquittal.

(App.164). Blair argued that the instruction was necessary because the State "failed to investigate and failed to inter-

view [Boswell] who was a witness." (Tr. 212).

During the trial, T.H. testified that Boswell lived with Blair, T.H. and Dawn when Blair committed the offenses. T.H. testified that during this time, Boswell "was becom[ing] blind, and her hearing, she was starting to lose her hearing," and "[s]he couldn't walk that well...." (Tr. 33). T.H. testified that Boswell's hearing deteriorated "[t]o the point of where if you were standing in the same room with her you had to yell for her to hear," and Boswell's vision deteriorated "to the point where you had to tell her who she was talking to because she could not see you." (Tr. 34). According to T.H., Boswell "mainly stayed in her room" approximately "90% of the time...." (Tr. 34). Dawn also testified that Boswell's "seeing was fuzzy," and she had "a hearing problem." (Tr. 107).

Bryan Flowers, a detective with the Warrick County Sheriff's Office, testified that he took over T.H.'s case in 2004, after Detective Kemp retired. As part of his investigation, Detective Flowers reviewed the interviews conducted by Detective Kemp. During his review of T.H.'s statements, Detective Flowers noted that T.H. referred to Boswell and that Boswell lived with the family when the incidents occurred. In her statement, T.H. stated that Boswell was " 'blind and ... almost deaf.' " (Tr. 12). In June of 2004, Detective Flowers spoke with Dawn regarding Boswell and discovered that Boswell was in a nursing home. Dawn told Detective Flowers that Boswell "had Alzheimer's, she was diabetic, and she was blind and ... referred to [Boswell] as being blind and deaf." (Tr. 12–13). Dawn also told Detective Flowers that during the time of the incidents, Boswell "was pretty much confined to her bedroom, so she never came out of the bedroom." (Tr. 13). Accordingly, Detective Flowers did not interview

Boswell. Detective Flowers further testified that he did not attempt to verify Boswell's condition. Boswell died in October of 2005.

On appeal, Blair argues that his tendered instruction is a correct statement of law and supported by the facts. In support of his assertion, Blair cites to *Porter v. Irvin's Interstate Brick & Block, Co., Inc.,* 691 N.E.2d 1363 (Ind.Ct.App.1998).

In *Porter,* a panel of this court reiterated that "the exclusive possession of facts or evidence by a party, coupled with the suppression of the facts or evidence by that party, may result in an inference that the production of the evidence would be against the interest of the party which suppresses it." 691 N.E.2d at 1364–65. Furthermore, the court stated that this rule "not only applies when a party actively endeavors to prevent disclosure of facts," but also when a party fails to produce available evidence. *Id.* at 1365.

Blair argues that "the failure of the investigating officers to gather material evidence by interviewing a material witness, [Boswell], and preserving her testimony is *functionally equivalent to a failure to produce available evidence.*" Blair's Br. 20 (emphasis added).

 Blair's tendered instruction is akin to a "missing witness" instruction. *See Bruce v. State,* 268 Ind. 180, 375 N.E.2d 1042, 1083 (1978) (addressing the instruction that "the nonproduction of a witness by a party able to produce him gives rise to a presumption that the testimony of that witness would be unfavorable to the party which could have produced him"). Generally, missing witness instructions are not favored in Indiana. *Snow v. State,* 560 N.E.2d 69, 72 (Ind.Ct.App.1990). A "missing witness" instruction "is appropriate only where the witness is available to be produced by one party but not by the other." *Id.* at 73. Furthermore, "[a]n

instruction calling for an adverse inference to be drawn from the failure to produce certain evidence is appropriate only where the evidence withheld is material to the trial issues and not cumulative." *Id.* at 72–73.

In this case, Blair failed to show that Boswell was available to the State but not available to Blair at trial. Additionally, Blair could have interviewed and/or deposed Boswell prior to her death. Furthermore, we agree with the State that Blair's tendered instruction is an incorrect statement of the law. While "the exclusive possession of facts or evidence by a party, coupled with the suppression of the facts or evidence by that party, may result in an inference that the production of the evidence would be against the interest of the party which suppresses it," *Porter*, 691 N.E.2d at 1364–65, Blair's tendered instruction provides for a negative inference due to the failure to investigate and interview a witness—not the suppression of evidence. Thus, we find no abuse of discretion in refusing Blair's tendered instruction.

### b. *Tendered Instruction No. 2*

■ Blair contends that the trial court erred in refusing the following tendered instruction:

> In this case, there has been evidence that the Prosecutor and/or police lost certain evidence. If you find that the State has intentionally, knowingly, recklessly, or negligently lost, destroyed, or failed to preserve evidence whose contents or quality are important to the issues of this case, then you should weigh the explanation if any given for the loss or unavailability of the evidence. If you find that such explanation is inadequate, then you draw an inference unfavorable to the State, which in itself may create a reasonable doubt as to the

> Defendant's guilt. If you believe that the State engaged in such conduct, then you may infer that such evidence would have been unfavorable to the State and beneficial to the accused.

(App.165).

Here, the State introduced into evidence copies of pages from T.H.'s journal, to which Blair objected. T.H. testified that she had written in the journal about "what [Blair] had done to her [her]...." (Tr. 49). In 2003, Dawn discovered the journal and gave it to Detective Kemp. T.H. testified that after Dawn turned the journal over to Detective Kemp, she never saw the journal again; did not compare the original journal to the copies; and that the journal was not copied in its entirety. T.H., however, testified that "[e]verything [she had] written in the journal" was introduced into evidence; the copies did not differ from what she wrote in the original journal; and she wrote the entries on the dates indicated. (Tr. 52).

The copies introduced into evidence read as follows. In an entry dated September 28, 2001, T.H. wrote, "he thinks I'm his personal whore and he can get screwed any day no matter who's home or when. I won't tell my mother because I'm scared she will hate me afterwards." (State's Ex. 2). T.H. testified that she was referring to Blair in the entry. In an entry dated January 14, 2003, T.H. wrote, "Kevin no longer lives with us.... I no longer have to be his personal whore." *Id.*

Detective Flowers testified that in reviewing Detective Kemp's file, he discovered notes made by Detective Kemp regarding the recovery of T.H.'s journal in July 2003. The file indicated that Dawn had recovered the journal from T.H.'s bedroom. Detective Flowers testified that he did not have a record of the journal being placed into evidence but that a copy of the journal was placed in Detective Kemp's

case report. Detective Flowers further testified that T.H. had identified the copy as having been made from her journal.[5]

 "The failure to preserve potentially useful evidence may constitute a denial of due process and require reversal where the criminal defendant can show bad faith on the part of the police." *Jewell v. State*, 672 N.E.2d 417, 425 (Ind.Ct.App.1996). Here, Blair has failed to demonstrate that the State "engaged in any willful conduct in destroying evidence." *See Nettles v. State*, 565 N.E.2d 1064, 1069 (Ind.1991). Thus, we find that the trial court properly refused Blair's tendered instruction. *See id.*

c. *Tendered Instruction No. 6*

 Finally, Blair contends that the trial court erred in refusing the following tendered instruction:

It is peculiarly within the power of the State to produce Jerry Kemp and/or the OB/GYN visited by [T.H.] in Nov. 2002, who could have given material testimony on an issue in this case. The State's failure to call Jerry Kemp and/or the OB/GYN visited by [T.H.] in Nov. 2002 may give rise to an inference that his/her testimony would be unfavorable to it.

You should bear in mind that the law does not impose on an accused in a criminal case the burden or duty of calling any witnesses or producing any evidence.

(App.169).

In this case, the State did not call Detective Kemp as a witness; rather, the State called Detective Flowers, who had taken

over T.H.'s case upon Detective Kemp's retirement. Although Detective Kemp did not testify during the trial, he did testify during a pre-trial hearing on March 14, 2006.[6] As to T.H. visiting a doctor, Dawn testified—in response to a juror's question—that T.H. visited a gynecologist in November of 2002.

 Again, a missing witness instruction, calling for an "adverse inference to be drawn from the failure to produce certain evidence" is appropriate only where 1) the withheld evidence is material to the trial issues; 2) the withheld evidence is not cumulative; and 3) the witness is available to be produced by only one of the parties. *Snow*, 560 N.E.2d at 72–73.

There is no evidence in the record that either Detective Kemp or the doctor were unavailable to Blair. Thus, Blair was not entitled to the instruction. *See Taylor v. State*, 676 N.E.2d 1044, 1046 (Ind.1997) (finding that the defendant was not entitled to a missing witness instruction where the evidence did not show that the State's chief investigator of the case was unavailable to the defendant). Furthermore, Blair fails to show that the State withheld any evidence or that testimony from Detective Kemp and the doctor would have contributed materially to the resolution of the issues. *See Snow*, 560 N.E.2d at 73. Accordingly, we find no error in refusing Blair's tendered instruction.

Affirmed.

MAY, J., and CRONE, J., concur.

---

5. We note that there also was testimony regarding a pornographic videotape recovered by Detective Kemp but not entered into evidence. Blair, however, does not address the videotape in his brief.

6. Detective Kemp only testified regarding T.H.'s allegations against Moore.