**Chaffew James Curtis SCOTT, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 48A05–0609–CR–527.

Court of Appeals of Indiana.

June 7, 2007.

David W. Stone, IV., Anderson, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Maureen Ann Bartolo, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

Chaffew James Curtis Scott ("Scott") was convicted by jury trial in Madison Circuit Court of Class C felony forgery and Class C felony money laundering. On appeal, he raises two issues:

I. Whether the convictions are supported by sufficient evidence; and,

II. Whether one of the convictions is barred by double jeopardy.

Concluding that Scott's convictions are supported by sufficient evidence and that they do not violate Indiana's double jeopardy clause, we affirm.

### Facts and Procedural History

In the summer of 2005, Scott moved to Anderson to be closer to his brother, who was serving a sentence in Pendleton Correction Facility for a forgery conviction. In October of 2005, Scott moved in with Gwendolyn Peoples ("Peoples"), her two children and her father. Once Scott moved in with Peoples he began looking for a job. His search often included trips to the public library and the Work One Center for Unemployment where he would email correspondents to look for work. Scott also posted his resume on several Internet job sites including Monster.com and CareerBuilder.com.

In September, a person purporting to be from German IT Corp. emailed Scott about becoming a financial representative for the company in the United States. According to the email, Scott would agree to accept invoice payments from the company's debtors located in the United States and then wire the money overseas to German IT in return for a ten percent commission. Scott agreed to accept the checks for German IT, and in a few days he received three checks each for $900 in the mail. The checks were in sequential order, the signature was misspelled, and the handwriting on various portions of the checks was not the same. Peoples warned

Scott that the checks "didn't look right." Tr. p. 53.

Despite this warning, Scott attempted to deposit the three checks into his account with the Teacher's Credit Union. The teller became suspicious and put a thirty-one-day hold on the checks. Monitoring his bank account online, Scott learned that the checks had not cleared and that he had been assessed fees. Scott stated that after he discovered the checks had not cleared, he "realized that [he had been] scammed." *Id.* at 115. Teacher's Credit Union lost no money in the transaction, and therefore made no report to the police.

However, Scott continued to answer the same types of emails asking for "financial representatives" in the United States. In November 2005, Scott responded to an email from someone alleging to work for Petate Industries. Scott said that he was interested in becoming a "financial controller" for the business and requested information be sent as soon as possible. Ex. Vol., Ex. 19. Scott also responded to a Maureen Lau ("Lau"), who alleged she was a Chinese citizen working for SKL Global Finance International in the United Kingdom. Lau proposed the exact same payment offer: checks would be sent to Scott who would then wire the money overseas minus his commission. Scott agreed to participate and forwarded Lau his name and contact information.

After this contact with Lau, Scott received a FedEx package in December 2005 with a check issued by Western Beef for more than $68,000. The check appeared to be written to Scott personally. Scott initially told Peoples, "I don't know where this check came from." Tr. p. 62. However, upon searching through his email, he discovered that Lau had the check delivered to him.

Scott attempted to open a bank account at several banks to deposit the check but learned that he needed a second form of identification. On January 10, 2006, after receiving a social security card, Scott went to Star Financial bank in Anderson to open an account. The customer service agent became suspicious that a company would write a personal check for more than $68,000 and called Western Beef to verify the transaction. She learned that the check had initially been issued to a fuel company called Amerada Hess Corporation and that it must have been tampered with. The bank personnel then called the Anderson police department.

Scott was transported to the Anderson police department where he was Mirandized and interviewed by Detective Trent Chamberlin ("Detective Chamberlin"). In this interview, Scott claimed that he believed he was legitimately employed by Lau and that he had kept all of the correspondence to prove his claim. He asked to call Peoples to bring Detective Chamberlin printouts of his email correspondence with Lau. However, Scott became visibly agitated when Peoples brought all of his email correspondence. Apparently, he did not want Detective Chamberlin looking through all of his emails. Instead, he wanted to pick out and find the emails specifically from Lau.

In the stack of emails, Detective Chamberlin found Scott's correspondence with Petate Industries and German IT regarding the same financial representative scheme. He also found correspondence relating to a Nigerian money scam. Scott admitted he knew the Nigerian scheme was fraudulent but claimed he was keeping the correspondence to turn over to the police. Tr. p. 120.

Scott also told Detective Chamberlin that he had never done business with German IT. When confronted with the copy of an email from German IT asking if

Scott had received three checks for $900, Scott said that he had never received those checks and that he had emailed German IT to tell them that he had not received the checks. Detective Chamberlin then asked Scott if he had tried to cash the three checks at Teachers Credit Union. Scott denied that he had. Detective Chamberlin told Scott that if he had tried to cash them, then the police would be able to obtain copies of the checks from the bank. Scott then changed his story and said that he had misunderstood the question.

On January 11, 2006, the State charged Scott with one count of forgery and one count of money laundering. A jury trial commenced on April 11, 2006. At trial, Western Beef's director of security and loss prevention testified that Western Beef had never had a relationship with Scott, nor had Western Beef authorized any check to be issued to Scott. On April 13, 2006, the jury found Scott guilty of both charges. The trial court conducted a sentencing hearing on May 1, 2006, sentencing Scott to two concurrent terms of four years with two years executed and two years suspended to informal probation. Scott now appeals. Additional facts will be added as necessary.

## I. Sufficiency of the Evidence

■ Initially, Scott challenges the sufficiency of the evidence supporting his convictions. In reviewing a sufficiency of the evidence claim, we neither reweigh the evidence nor assess the credibility of the witnesses. *Love v. State,* 761 N.E.2d 806, 810 (Ind.2002). We must respect the jury's exclusive province to weigh conflicting evidence. *McHenry v. State,* 820 N.E.2d 124, 126 (Ind.2005). On review, we look to the evidence most favorable to the verdict and reasonable inferences drawn therefrom. *Id.* We will affirm the conviction if there is probative evidence from which a reasonable jury could have found

the defendant guilty beyond a reasonable doubt. *Id.*

### A. Money Laundering

■ Regarding Scott's money laundering conviction, Scott contends that the State did not present sufficient evidence that he knew Maureen Lau was involved in a criminal activity when he agreed to accept and deposit checks. Under the Indiana Code, a person commits money laundering if he or she knowingly or intentionally

(1) acquires or maintains an interest in, receives, conceals, possesses, transfers, or transports the proceeds of criminal activity;

(2) conducts, supervises, or facilitates a transaction involving the proceeds of criminal activity; or

(3) invests, expends, receives, or offers to invest, expend, or receive, the proceeds of criminal activity or funds that are the proceeds of criminal activity, and the person knows that the proceeds or funds are the result of criminal activity

Ind.Code § 35–45–15–5(a) (2004).

There is no Indiana case law analyzing the evidence the State must present to prove the mens rea requirement of Indiana's money laundering statute. However, Indiana case law is well settled that "knowledge ... may be inferred from the facts and circumstances of each case." *Lykins v. State,* 726 N.E.2d 1265, 1270–71 (Ind.Ct.App.2000) (citation omitted).

Here, the State presented evidence that even a rudimentary Internet search of the words "Nigerian bank" or "Maureen Lau" immediately alerts a searcher that these terms are associated with illegal money scams. In fact in 2005, a U.S. Bankruptcy Court in Florida remarked on the widespread notoriety of Nigerian business scams, including comedy skits portraying

the scams. *In re Maxwell,* 334 B.R. 736, 740 (Bkrtcy.M.D.Fla.2005). Scott claimed that he had researched these companies to verify that they were legitimate, and he further acknowledged that he knew the Nigerian bank scheme was a scam. It is apparent that he was savvy enough with the Internet to have conducted such searches as he had printed out several websites on Nigerian banks. Ex. Vol., Ex. 7.

In addition, the jury viewed a videotape of Detective Chamberlin interviewing Scott on the day that he attempted to deposit the check for more than $68,000. Scott initially told the detective that this was the first time he had ever tried to cash a check in this sort of business. *Id.* Scott appeared agitated when Detective Chamberlin reentered the interview room with a stack of Scott's email correspondence. Scott seemed very hesitant to allow Detective Chamberlin to look through all of this correspondence. When Detective Chamberlin asked him about his correspondence with German IT, Scott denied having received three checks through that company, while continuously stating that he had "no criminal intentions." *Id.*

 Copies of Scott's emails show that he had been corresponding with multiple individuals, including German IT, Maureen Lau, Petate Industries, and even a few people purportedly from Nigeria. All of this correspondence pertained to similar money laundering scams. Scott's lie about his involvement with German IT coupled with his various email correspondence with individuals involved in similar schemes certainly support a reasonable inference that Scott knew he was agreeing to facilitate Maureen Lau's illegal activity. A reasonable inference from the evidence supporting a verdict is enough for us to find evidence to be sufficient. *Herron v. State,*

808 N.E.2d 172, 176 (Ind.Ct.App.2004), *trans. denied.*

**B. *Forgery***

 Next, Scott maintains that the State did not present sufficient evidence that he had any intent to defraud Western Beef, the issuer of the check. It is well established that "[t]he element of intent may be proven by circumstantial evidence alone, and it is well-established that knowledge and intent may be inferred from the facts and circumstances of each case. The State is not required to prove intent by direct and positive evidence." *Lykins,* 726 N.E.2d at 1270–71 (citation omitted).

 The check for more than $68,000 that Scott attempted to deposit was issued from Western Beef, a meat manufacturer in New York. Frank O'Hara, director of security and loss prevention at Western Beef, testified that the $68,000 check was initially made payable to Amerada Hess Corporation in Newark, a company that supplied fuel to Western Beef's trucking fleet. Scott acknowledged that he never had any connections with Western Beef. In fact, when he first received the check, he admitted that he did not know who had sent it to him until after he had checked his email. Additionally, as discussed above, a jury could infer from Scott's correspondence regarding similar scams and his lie to Detective Chamberlin about his involvement with German IT that Scott knew of the illegality of the Western Beef check.

 The trier of fact is entitled to determine which version of the incident to credit. *Reyburn v. State,* 737 N.E.2d 1169, 1171 (Ind.Ct.App.2000) (citation omitted). Scott's claim amounts to an invitation to reweigh the evidence, which we will not do. Thus, we conclude that the State's evidence was sufficient to support

Scott's convictions for forgery and money laundering.

## II. Double Jeopardy

Scott next claims that his convictions for forgery and money laundering violate Indiana's double jeopardy clause. He maintains that these convictions were based on the same conduct of attempting to deposit the check from Western Beef.

In Indiana:

[t]wo or more offenses are the same offense in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense. However, under the *Richardson* actual evidence test, the Indiana Double Jeopardy Clause is not violated when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense.

*Miller v. State,* 790 N.E.2d 437, 439 (Ind. 2003) (quotations omitted; citing *Richardson v. State,* 717 N.E.2d 32 (Ind.1999)).

Scott seems to admit that the statutory elements test was not violated, but he claims that the actual evidence presented does not establish separate and distinct facts to support the convictions. He contends that both offenses arose from the single act of attempting to deposit a stolen and altered check. Br. of Appellant at 8. There have not been any Indiana cases analyzing whether convictions for forgery and money laundering may violate the prohibition against double jeopardy.

■■■■■ To show that two challenged offenses constitute the same offense under the actual evidence test, "a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense." *Richardson,* 717 N.E.2d at 53. Application of the actual evidence test requires the reviewing court to identify the essential elements of each of the challenged crimes and to evaluate the evidence from the jury's perspective, considering where relevant the jury instructions, argument of counsel, and other factors that may have guided the jury's determination. *Id.* at 54 n. 48; *see, e.g., Burnett v. State,* 736 N.E.2d 259, 262–63 (Ind.2000). "[U]nder the *Richardson* actual evidence test, the Indiana Double Jeopardy Clause is not violated when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense." *Spivey v. State,* 761 N.E.2d 831, 833 (Ind. 2002).

■■■■ At Scott's trial, the court read to the jury the statutes pertaining to both money laundering and forgery. As discussed above, under the Indiana Code, a person commits money laundering if he or she knowingly or intentionally

(1) acquires or maintains an interest in, receives, conceals, possesses, transfers, or transports the proceeds of criminal activity;

(2) conducts, supervises, or facilitates a transaction involving the proceeds of criminal activity; or

(3) invests, expends, receives, or offers to invest, expend, or receive, the proceeds of criminal activity or funds that are the proceeds of criminal activity, and the person knows that the proceeds or funds are the result of criminal activity

Ind.Code § 35–45–15–5(a) (2004). The offense is a Class C felony if the value of the

proceeds or funds is at least fifty thousand dollars ($50,000). *Id.*

The evidentiary facts establishing that Scott committed money laundering established that Scott had been corresponding with Maureen Lau, had agreed to receive checks from her, and had in fact received a check from her for more than $50,000 in furtherance of the scheme. Scott sent Lau information so that she could alter the checks to be payable to him. Without Scott's agreement to participate in the scheme, the check would not have been altered with his name and sent to his address. The State further presented circumstantial evidence that when Scott agreed to receive checks from Lau, he knew the scheme involved criminal activity because of his previous dealings with German IT's scam, his correspondence with others involving Nigerian money scams, as well as his Internet research on similar schemes.

Wade Gault ("Gault"), a special agent with the United States Secret Service, testified at length about how these schemes work. The individuals in charge of the scams will steal legitimate checks and alter the name and sometimes even the amount on the check. Then they will send the checks to recipients who have agreed to participate. After the recipients have deposited the checks, they will send urgent orders to wire a certain percentage of the money overseas. Usually, the money ends up in Nigeria or another county where the United States does not have jurisdiction to prosecute the offenders. Tr. pp. 102–103.

Under Indiana law, offering or agreeing to receive proceeds from a criminal activity is money laundering. Ind.Code § 35–45–15–5(a)(3). Knowingly facilitating such a laundering scheme is also money laundering. Ind.Code § 35–45–15–5(a)(2). Therefore, the instant that Scott agreed to receive the altered checks to help facilitate the scheme, he became criminally liable for money laundering. Although the jury may have considered evidence that Scott actually attempted to deposit a check in furtherance of the money laundering activity, this evidence was unnecessary to establish that he had committed money laundering under the Indiana Code.

Indiana Code's provision on forgery provides:

> (b) A person who, with intent to defraud, makes, utters, or possesses a written instrument in such a manner that it purports to have been made:
>
> (1) by another person;
>
> (2) at another time;
>
> (3) with different provisions; or
>
> (4) by authority of one who did not give authority;
>
> commits forgery, a Class C felony.

Ind.Code § 35–43–5–2 (2004 & Supp.2006).

Scott's forgery conviction was established by his attempting to utter, or deposit, a check that he knew had been altered and that he did not have the authority to deposit. To support this conviction, the State presented evidence that Scott had no connections with Western Beef and that initially he did not know who had sent him the check. At trial, Western Beef's director of security and loss prevention testified that Western Beef had never had a relationship with Scott, nor had Western Beef authorized any check to be issued to Scott. This evidence establishes that in attempting to present the forged check to the bank, Scott was attempting to defraud Western Beef.

To find Scott guilty of both forgery and money laundering requires proof of at least one unique evidentiary fact. *Bald v. State,* 766 N.E.2d 1170, 1172 (Ind.2002). For Scott's forgery conviction, the unique fact is that Scott uttered or presented a forged check to the bank to be deposited

into his account. For Scott's money laundering conviction, the unique fact is that Scott agreed to facilitate a broader money-laundering scheme, wherein he agreed to receive and deposit altered checks. In addition, Scott agreed to wire ninety percent of the money overseas, or in other words to facilitate the transaction involving criminal proceeds. Scott did indeed receive a check from Lau for $68,000 in furtherance of this scheme. Because each conviction was established by at least one unique evidentiary fact, we conclude that Scott's convictions do not violate Indiana's prohibition against double jeopardy.

### Conclusion

Scott's convictions are supported by sufficient evidence and they do not violate Indiana's double jeopardy clause.

Affirmed.

DARDEN, J., and KIRSCH, J., concur.