

FILED

Jan 25 2019, 5:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ellen M. O'Connor
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jackie Harold Parsley, II, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | January 25, 2019 <br><br> Court of Appeals Case No. <br> 18A-CR-72 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Grant W. Hawkins, Judge <br><br> Trial Court Cause No. <br> 49G05-1504-F5-13873 |

**Sharpnack, Senior Judge.**

## Statement of the Case

[1]  Jackie Harold Parsley, II, in conjunction with members of his family, improperly claimed a $2 million dollar prize from the Hoosier Lottery through a scratch-off lottery ticket. He and others then spent the proceeds on vehicles

and other goods. Parsley appeals his convictions of false passing of a lottery ticket, a Level 5 felony;[1] theft, a Level 5 felony;[2] and five counts of money laundering, all Level 6 felonies.[3] We affirm.

## Issue

Parsley raises one issue, which we restate as: whether there is sufficient evidence to sustain his convictions.

## Facts and Procedural History

Parsley managed Parsley's Package Liquors (PPL), a liquor store in Plainfield, Indiana. PPL was a family business: Parsley's grandparents had owned it, and Parsley's uncle, Jimmy Parsley, Sr., handled the accounting and taxes. After Parsley's grandmother passed away in 2012, Jimmy was the executor of her estate and monitored the store.

We will discuss the facts in more detail below, but PPL sold Hoosier Lottery scratch-off tickets in addition to liquor. Store employees were forbidden to buy or otherwise use lottery tickets sold at the store. The Lottery had suspended

---

[1] Ind. Code § 4-30-14-3 (2014).

[2] Ind. Code § 35-43-4-2 (2014).

[3] Ind. Code § 35-45-15-5 (2014). We note a discrepancy in the record as to Count VIII, the first of the five counts of money laundering. The charging information, jury instructions, and jury verdict form all describe that count as a Level 6 felony. Further, the State claimed at sentencing that the offense was a Level 6 felony, and the trial court also described it as such. Conversely, the trial court's chronological case summary, sentencing order, and abstract of judgment all describe Count VIII as a Class D felony. We find no explanation for the discrepancy. In their briefs, both parties describe the charge as a Level 6 felony, and we will address it accordingly.

PPL's license to sell tickets from May 24, 2014 to September 26, 2014, for paperwork issues, and Parsley was supposed to have returned all scratch-off tickets to the Lottery after PPL's lottery license was suspended.

[5] On October 3, 2014, Ashlee Campbell, now known as Ashlee Parsley, arrived at the Hoosier Lottery's offices in Indianapolis. She was accompanied by her then-fiancé, Joseph Parsley. Joseph is Parsley's brother. Ashlee presented a winning scratch-off ticket from a game named "100 X the Cash." Tr. Ex. Vol., State's Ex. 22A. The prize was $2 million. During the prize validation process, Ashlee told a Lottery employee she had purchased the ticket at PPL on October 1, 2014, at 8:30 p.m. She selected a lump sum payment rather than annual payments through an annuity, and the Lottery gave her a check for $1,139,948.09. Ashlee and Joseph bought a house, a vehicle, and a trailer for themselves, and Ashlee bought a truck for Parsley.

[6] Jimmy soon learned that Ashlee had claimed a $2 million lottery prize through a ticket she had purportedly bought at PPL. He was concerned that Ashlee may have obtained the ticket improperly and contacted the Hoosier Lottery.

[7] The Lottery began an investigation in November 2014 and later contacted the police. On April 22, 2015, the State charged Parsley with the offenses set forth above as well as several others that the State later dismissed on the eve of trial. Parsley was tried jointly with Ashlee and Joseph, whom the State had also charged with various offenses. A jury determined that Parsley was guilty of

false passing of a lottery ticket, theft, and five counts of money laundering.  The

trial court imposed a sentence, and this appeal followed.[4]

# Discussion and Decision

## I. Standard of Review

[8]     When an appellant challenges the sufficiency of the evidence supporting his or

her convictions, "the appellate posture is markedly deferential to the outcome

below."  *Bowman v. State*, 51 N.E.3d 1174, 1181 (Ind. 2016).  We neither

reweigh evidence nor judge witness credibility.  *McCallister v. State*, 91 N.E.3d

554, 558 (Ind. 2018).  We instead look to the evidence and reasonable

inferences drawn therefrom that support the verdict.  *Leonard v. State*, 73 N.E.3d

155, 160 (Ind. 2017).  We will affirm the convictions if there is probative

evidence from which a reasonable jury could have found the defendant guilty

beyond a reasonable doubt.  *Id.*

[9]     The State alleged that Parsley committed his offenses in conjunction with

Ashlee and Joseph, and the trial court instructed the jury on accomplice

liability.  "A person who knowingly or intentionally aids, induces, or causes

another person to commit an offense commits that offense . . . ."  Ind. Code §

35-41-2-4 (1977).  We consider the following factors in determining whether a

---

[4] During trial, the court granted Joseph's motion for judgment on the evidence on all charges.  Tr. Vol. IV, p. 194.  By contrast, the jury determined Ashlee was guilty of multiple offenses.  She appealed, and a panel of this Court affirmed her convictions in a Memorandum Decision.  *Parsley v. State*, No. 18A-CR-221 (Ind. Ct. App. Dec. 12, 2018).

defendant aided another in the commission of a crime: (1) presence at the scene of the crime; (2) companionship with another engaged in a crime; (3) failure to oppose the commission of the crime; and (4) the course of conduct before, during, and after the occurrence of the crime. *Wieland v. State*, 736 N.E.2d 1198, 1202 (Ind. 2000). Accomplice liability applies to the contemplated offense and to all acts that are a probable and natural consequence of the concerted action. *Id.* It is not necessary for the jury to find that a defendant participated in every element of the crime. *Vitek v. State*, 750 N.E.2d 346, 352 (Ind. 2001). Further, an accomplice may be convicted of aiding another person in committing an offense even if the other person is acquitted of the offense. Ind. Code § 35-41-2-4.

[10] Parsley claims the State failed to prove he had the mental culpability to commit the offenses of which he was convicted. A defendant's intent may be proved by circumstantial evidence. *Phipps v. State*, 90 N.E.3d 1190, 1195 (Ind. 2018). Circumstantial evidence alone may be sufficient to support a conviction. *Jones v. State*, 780 N.E.2d 373, 376 (Ind. 2002). Circumstantial evidence will be deemed sufficient if inferences may reasonably be drawn that enable the trier of fact to find the defendant guilty beyond a reasonable doubt. *Pierce v. State*, 761 N.E.2d 821, 826 (Ind. 2002).

## II. False Passing of a Lottery Ticket

[11] To obtain a conviction of false passing of a lottery ticket as charged, the State was required to prove beyond a reasonable doubt that (1) Parsley, as an

accomplice or a principal, (2) falsely passed a lottery ticket (3) with intent to defraud. Ind. Code § 4-30-14-3.

[12] It is necessary to begin our analysis with an overview of the Hoosier Lottery's rules and procedures for scratch-off ticket games, as described in the record. The Lottery enters into licensing agreements with retailers to sell scratch-off games.[5] Retailers receive, and are required to use, lottery computers to track tickets. The computers are connected to the Lottery's ticket tracking system. Retailers may also obtain vending machines to sell scratch-off tickets.

[13] The Lottery, through a contractor named IGT, creates and sells a variety of scratch-off ticket games. The games vary in price from $1 up to $25 per ticket, with prize values ranging from $1 to millions of dollars. When a retailer orders tickets for a specific scratch-off game, the Lottery sends the tickets to the retailer in packs. Each ticket and pack are numbered, and the Lottery keeps track of which packs are sent to which retailers.

[14] Upon receiving a pack of tickets, a retailer is required to notify the Lottery of receipt of the pack by scanning it at the store's lottery computer. When a retailer is ready to place the tickets on sale to customers, the retailer "activates" a pack by scanning it at the computer once again. Tr. Vol. II, p. 89. The dates of receipt and activation are tracked in the Lottery's records. A ticket purchaser

---

[5] Retailers may also sell draw ticket games such as the Hoosier Lotto and Powerball, but those types of games are not at issue here.

may validate a ticket, and thus confirm that it is a winning ticket, by scanning it at a computer at any authorized lottery retailer. Validations are also tracked by the Lottery. Retailers are required to maintain a separate bank account for lottery purposes, and the Lottery has electronic access to the accounts. The Lottery takes payment for ticket packs by removing the funds from the retailers' bank accounts.

[15] Among other restrictions, retail store owners and employees, as well as relatives who live with store owners or employees, may not buy or otherwise use lottery tickets that are sold at that store. Ind. Code § 4-30-12-4 (1989). This prohibition is explained during the licensing process, and the Lottery sends reminders to retailers via monthly newsletters. Further, any lottery prizes worth $50,000 or more may be validated at any retail location, but the prize must be claimed in person at the Hoosier Lottery's offices.

[16] The Hoosier Lottery may suspend or terminate a retailer's license for a variety of reasons. If a license is suspended, the retailer is no longer permitted to activate or sell scratch-off tickets, and their computer is disconnected from the Lottery's system until the suspension is lifted. Suspended retailers are required by their licensing agreements to return unsold tickets to the Lottery, which in turn credits the retailers' bank accounts. In general, the Lottery does not independently track unsold tickets in the possession of suspended retailers, expecting that retailers will want to return those tickets to receive credit from the Lottery.

[17] We now turn to the specific circumstances of this case. PPL was licensed to sell Hoosier Lottery scratch-off tickets. The store had a lottery computer and a cash register for lottery sales, in addition to a separate register for liquor sales. The store also had a ticket vending machine. Parsley, as the store's manager, monitored lottery sales and interacted with Fronda Fisher, the Lottery's sales representative for the store.[6] Fisher trained him on the lottery computer. She knew Joseph and Ashlee because she saw them at the store from time to time.

[18] Parsley chose which scratch-off games to sell. Parsley's uncle, Jimmy, generally required that the more expensive tickets – the ones that cost $20, and had correspondingly more valuable prizes – were sold in the vending machine rather than at the counter to prevent theft. Parsley was authorized to deposit proceeds from ticket sales in PPL's bank account, and he usually made the deposits.

[19] After Parsley's grandmother passed away in 2012, Jimmy was the executor of her estate. He and his siblings decided to sell the store. Parsley offered to buy the store through a financing arrangement, but Jimmy wanted to receive an upfront payment and sought out other potential buyers. Jimmy's rejection of Parsley's offer caused friction between them.

[20] In May 2014, Parsley filed an application with the Hoosier Lottery, seeking to renew the store's license to sell tickets until the store could be sold. Parsley

---

[6] Fisher was employed by the Lottery's contractor, IGT.

filled out the application, listing himself as PPL's primary contact person. He and Jimmy signed the application. Parsley also signed an attachment to the application, in which he indicated he understood that if the store's lottery license was suspended, he was obligated "to return to the Lottery all Tickets, goods, materials and equipment delivered to the Retailer under this Agreement in the same condition it was given to the Retailer." Tr. Ex. Vol., State's Ex. 2.

[21] The Lottery questioned the renewal application because of uncertainty about the store's ownership status arising from the death of Parsley's grandmother. As a result, the prior license expired without renewal, and on June 24, 2014, the Lottery placed PPL on suspension.

[22] Jimmy asked Fisher to pick up unsold scratch-off tickets so that PPL could receive credit for them. On July 17, 2014, Fisher met with Parsley at the store. She removed all tickets from the vending machine and looked in a box behind the counter where she knew store employees sometimes kept packs of tickets that were ready to be sold. Fisher did not find, and was not given, any tickets other than those in the vending machine. Fisher did not search the entire store, relying instead on Parsley's representation that she had been given all unsold tickets. She filled out a form indicating which tickets she had received, and she left a copy at PPL. Fisher delivered the returned tickets to the Lottery's offices for processing.

[23] According to the Lottery's records, on May 30, 2014, PPL had electronically acknowledged receipt of ticket pack 57013. That pack contained twenty-five

tickets for the game "100 X the Cash," with a sale price of $20 each. The prizes for winning tickets from that pack ranged from $20 to $2 million. The tickets were larger than the norm: approximately nine inches long and three and a half inches wide. Tr. Ex. Vol., State's Ex. 22A. The scratch-off coating on the tickets was orange in color, but removing the coating revealed the game's numbers, printed on a pink background. Fisher did not receive pack 57013 from Parsley on July 17, 2014, and it was never returned to the Lottery.

[24] At some point after Fisher visited the store, Jimmy dropped by and discovered that store employees were still selling activated scratch-off tickets at Parsley's direction. The tickets were for lower-stakes games, costing one or two dollars each. He further discovered that store employees had paid out prize money for ten to twelve winning tickets at Parsley's direction, even though the tickets could not be validated at the store because the computer had been deactivated. Jimmy instructed the employees to stop selling tickets and to stop paying prizes for winning tickets.

[25] The Lottery's electronic records show that on September 16, 2014, someone attempted to validate a winning ticket from the game "100 X the Cash" at a convenience store a half-block from PPL. The ticket was number 7, from pack number 57013. The validation attempt failed because pack 57013 had not yet been activated.

[26] Parsley urged Jimmy to renew the store's license with the Hoosier Lottery, claiming customers had complained about the store's inability to sell lottery

tickets. Parsley also texted Fisher several times in August and September 2014, asking for her help in renewing the license. On September 23, 2014, Parsley submitted another application to the Lottery. He had prepared it, and Jimmy had signed it. Parsley listed himself as PPL's primary contact person. The Lottery approved the application and renewed the Store's license, taking effect on September 26, 2014. On the morning of September 26, 2014, Parsley texted Fisher again to request assistance, asserting that the computer was still inoperable. By that time, Jimmy had agreed to sell PPL to Payless Liquors, and the transaction was scheduled to occur on October 3, 2014.

[27] PPL's lottery computer was activated later on September 26, 2014. The Hoosier Lottery's electronic records show that on September 26, 2014, pack 57013 for the game "100 X the Cash" was activated at PPL's computer at around 5:08 p.m. Tr. Vol. II, p. 180; Tr. Ex. Vol., State's Ex. 35. No other packs were activated at that time, and pack 57013 was the only pack that was activated at PPL between September 26, 2014, and October 3, 2014.

[28] Jimmy had installed a network of eight security cameras inside and outside the store, allowing him to view both cash registers and the lottery terminal, among other locations in the store. On September 26, 2014, his security cameras recorded Parsley standing at the lottery computer at the time when pack number 57013 was activated. Next, Parsley went outside, empty handed, and returned to the store holding a scratched-off "100 X the Cash" ticket. He then left again, walking down the street. The Hoosier Lottery's records show that within a few minutes, ticket 7 from pack 57013 was validated at a convenience

store a half-block from PPL for a $25 prize. The convenience store was the same location where an unidentified person had attempted to validate the same ticket on September 16, 2014.

[29] On September 30, 2014, Ashlee entered a different convenience store in Plainfield and validated two "100 X the Cash" tickets from pack number 57013. The tickets, numbers five and six, had prizes of $25 and $20, respectively.

[30] Meanwhile, Jimmy asked Fisher to return to PPL to collect the unsold tickets that employees had been selling. He told Fisher he was selling the store and wanted credit for the tickets before the sale. She met Jimmy at the store on the morning of October 1, 2014. Parsley was not present. Fisher accessed the lottery computer and scanned in six packs of tickets that Jimmy gave her. The tickets ranged in cost from $1 to $5. Jimmy did not have any "100 X the Cash" tickets.

[31] On October 3, 2014, the same day PPL was sold, Ashlee and Joseph arrived at the Hoosier Lottery's offices to claim a winning "100 X the Cash" ticket from pack 57013. The ticket, bearing number 12, had a prize of $2 million. Ashlee claimed she bought it at PPL on October 1, 2014, at 8:30 p.m., but a subsequent review of Jimmy's security camera footage showed that she did not buy any lottery tickets at PPL on that day.

[32] Ultimately, eight winning tickets from pack 57013 were validated and claimed between September 26, 2014, and October 5, 2014. Earl Andrew Morgan, an investigator for the Hoosier Lottery, testified that in his experience there were

"red flags" that might cause the Lottery to question whether winning tickets were obtained improperly. Tr. Vol. III, p. 110. One red flag occurs when all the winning tickets from a pack are redeemed at locations other than the selling retailer. In this case, several low-value winning tickets were validated at PPL between September 26, 2014, and October 3, 2014, but none of the winning tickets from pack 57013 were redeemed at PPL. They were instead redeemed at retailers in Plainfield and Indianapolis. Another red flag occurs when the winning tickets from a pack are not redeemed in roughly sequential order, either from lowest ticket number to highest ticket number or vice versa. The winning tickets from pack 57013 were not redeemed in sequential order. A third red flag occurs when someone attempts to validate tickets from a pack that has not been activated. Ticket 7 from pack 57013 was scanned several days before being activated and properly validated.

[33]     A jury could reasonably conclude from this mostly circumstantial evidence that although Parsley knew he was barred from purchasing or using PPL's scratch-off lottery tickets, and he further knew he was required to return all unsold tickets to the Hoosier Lottery after PPL's license was suspended, he: (1) secretly kept pack 57013 of the "100 X the Cash" game; (2) scratched off the tickets to find the winners; (3) sought to renew PPL's lottery license even though he knew the store would soon be sold; (4) activated the pack once the license was renewed; and (5) worked with Ashlee and Joseph to redeem the $2 million winning ticket from the pack.

Parsley claims Ashlee may have legitimately bought the $2 million ticket at PPL on September 30, 2014, and merely misspoke about the date of purchase when she claimed the prize. He further claims, and argued to the jury, that Ashlee was not the person shown on a surveillance video validating tickets numbers five and six at a convenience store near PPL on September 30, 2014. Parsley also characterizes the Lottery's data about sales and validations as "more assumption and guesswork than proof." Appellant's Br. p. 16. These arguments are merely requests to reweigh the evidence, contrary to our standard of review. The State presented sufficient evidence of Parsley's fraudulent intent, and we affirm his conviction of false passing of a lottery ticket.

## III. Theft

To obtain a conviction of theft as charged, the State was required to prove beyond a reasonable doubt that (1) Parsley, as a principal or accomplice (2) knowingly or intentionally (3) exerted unauthorized control (4) over the Hoosier Lottery's property valued at more than $50,000 (5) with intent to deprive the Lottery of any part of its value or use. Ind. Code § 35-43-4-2.

We incorporate our discussion of the facts set forth above. A reasonable jury could have concluded from the facts most favorable to the judgment that Parsley knowingly or intentionally worked with Ashlee and Joseph to cash in a winning lottery ticket that he should not have had or used, resulting in Ashlee obtaining a check from the Lottery for $1,139,948.09. Ashlee and Joseph subsequently used the Lottery's funds to purchase a house and vehicles for

themselves, and a vehicle for Parsley.  There is sufficient circumstantial evidence of Parsley's intent to sustain the theft conviction.

# IV. Money Laundering

[37] To obtain five convictions of money laundering as charged, the State was required to prove beyond a reasonable doubt that for each of the five charges (1) Parsley, as a principal or accomplice, (2) knowingly or intentionally (3) acquired or maintained an interest in, received, concealed, possessed, transferred, or transported the proceeds of criminal activity.  Ind. Code § 35-45-15-5.  The State identified the acts and proceeds at issue for each count as follows:

| Count VIII | Purchased a 2012 GMC Acadia |
| Count IX | Purchased a 2013 Ford F150 truck |
| Count X | Purchased real estate in Coatesville, Indiana |
| Count XI | Purchased a 2015 Trailer CH820 |
| Count XII | Transferred United States currency between bank accounts |

Appellant's App. Vol. II, pp. 45-46.

[38] We incorporate our discussion of the facts set forth above.  Parsley does not dispute that Ashlee and Joseph purchased the vehicles and the real estate, and that they transferred some of the remaining prize money between bank accounts.  He instead argues that he did not knowingly or intentionally

participate in these transactions with the understanding that the lottery winnings were the proceeds of criminal activity. We disagree. There is ample circumstantial evidence that Parsley chose to conceal pack 57013 rather than return it to the Lottery, and he worked with Ashlee and Joseph to claim the $2 million prize ticket because he knew he could not have done so himself. Without Parsley, Ashlee and Joseph would not have had access to the winning ticket.

[39] There is also evidence that Parsley was an accomplice to Ashlee and Joseph's use of the lottery proceeds. Ashlee told an investigator that she bought the Ford truck for Parsley, and during a search of the truck an investigator found Parsley's wallet and identification. This is sufficient evidence of Parsley's intent to commit money laundering, as an accomplice. Parsley's arguments are requests to reweigh the evidence. *See Scott v. State*, 867 N.E.2d 690, 695 (Ind. Ct. App. 2007) (circumstantial evidence sufficient to sustain money laundering conviction; Scott received and attempted to cash a check he had reason to believe was stolen), *trans. denied*.

# Conclusion

[40] For the reasons stated above, we affirm the judgment of the trial court.

[41] Affirmed.

[42] Riley, J., and Mathias, J., concur.