## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 27 2020, 6:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Lisa M. Johnson
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

John Northerner,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff*

April 27, 2020

Court of Appeals Case No.
19A-CR-1994

Appeal from the Marion Superior Court

The Honorable Grant W. Hawkins, Judge

Trial Court Cause No.
49G05-1701-F1-264

**May, Judge.**

John Northerner appeals his convictions of two counts of Level 1 felony child molesting;[1] three counts of Level 4 felony child molesting;[2] two counts of Class A felony child molesting;[3] and one count of Class C felony child molesting.[4] He raises four issues, which we revise, reorder, and restate as:

1. Whether the State's medical expert gave improper opinion testimony, resulting in fundamental error;

2. Whether the trial court erred in denying Northerner's motion for a mistrial;

3. Whether the State committed prosecutorial misconduct during closing argument, resulting in fundamental error; and

4. Whether the State presented sufficient evidence to sustain his convictions.

We affirm.

# Facts and Procedural History

---

[1] Ind. Code § 35-42-4-3(a) (2014 & 2015) (change in statute effective July 1, 2015, not material in case at bar).

[2] Ind. Code § 35-42-4-3(b) (2014 & 2015) (change in statute effective July 1, 2015, not material in case at bar).

[3] Ind. Code § 35-42-4-3(a) (2007).

[4] Ind. Code § 35-42-4-3(b) (2007).

[2] Northerner is the uncle of both E.E. and S.M.M. Northerner's wife, Aumanda Northerner, is the sister of their mother, Shannon Strong. Northerner and Aumanda have two daughters, N.A.N. and N.I.N. E.E. and S.M.M. live primarily with Strong. However, from shortly after S.M.M. was born until she was about thirteen years old, S.M.M. would regularly stay the night at Northerner's house in Indianapolis. E.E. would also regularly spend the night at Northerner's house beginning shortly after she was born. E.E. has ADHD and is on the spectrum for autism. E.E. was twelve years old at the time of trial, and S.M.M. was seventeen years old.

[3] In July or August 2012, S.M.M. spent the night at Northerner's house. S.M.M., N.A.N., and N.I.N. were sleeping on the floor in the living room. S.M.M. woke up during the middle of the night. When she woke up, she felt Northerner's fingers in her vagina. Her pants and underwear were pulled down to her ankles, and her blanket had been removed. Northerner was kneeling near her feet and had a beer bottle sitting next to him. S.M.M. did not scream, yell, or say anything because she was scared. S.M.M. heard footsteps on the floor as Aumanda walked out of her bedroom. Northerner then put the blanket back over S.M.M. and left the living room. S.M.M. went to the bathroom and noticed a couple drops of blood on her underwear. S.M.M. did not tell anyone what happened until years later.

[4] When E.E. was six years old, she spent the night at Northerner's house. E.E. and S.M.M. slept on the living room floor while N.A.N., N.I.N., and two of their friends slept on the couch. E.E. woke up when she felt Northerner rolling

her from her side to her back. Northerner was kneeling by E.E. and had a beer with him. He pulled E.E.'s blanket off her, and he pulled her pants and underwear down to her ankles. Northerner then pulled his pants down and inserted his penis into E.E.'s vagina. E.E. did not say anything. Eventually, a timer went off in the kitchen. When Aumanda walked from her bedroom to the kitchen, Northerner pulled up E.E.'s pants and underwear. He also pulled up his own pants and went into the kitchen. Northerner and Aumanda then retired to their bedroom.

[5] Later that night, Northerner came back into the living room. Northerner pulled down E.E.'s pants and underwear. He also pulled down his own pants. Northerner put his mouth on E.E.'s vagina, and E.E. felt Northerner's tongue move from side to side. After about four minutes, Northerner stopped. E.E. did not say anything during the encounter, and she went back to sleep when it was over.

[6] E.E. continued to visit Northerner's house and play with N.A.N. and N.I.N. When E.E. was eight, Northerner told E.E. that he wanted to show her something in their finished basement. Aumanda, N.A.N., and N.I.N. stayed upstairs, but E.E. and Northerner went down to the basement. E.E. sat on a couch in the basement. Northerner then pulled E.E.'s pants and underwear down to her ankles. Northerner also pulled down his own pants and inserted his penis into E.E.'s vagina for about four minutes.

Another time, E.E. and Northerner were in a bathroom in the basement. There was a "spinning chair" with a footrest in the bathroom. (Tr. Vol. II at 97.) The chair was like those commonly found in hair salons. E.E. was sitting in the chair and Northerner was standing in front of her. Northerner asked E.E. to pull her pants down, but she refused. Northerner then pulled down her pants and underwear. Northerner also pulled down his own pants and underwear. He then inserted his tongue into E.E.'s vagina and moved it from side to side. Next, Northerner put his penis in E.E.'s vagina. They then heard what sounded like N.A.N. and N.I.N. coming down into the basement. E.E. pulled up her pants and underwear, and Northerner did the same. N.A.N. and N.I.N. did not end up coming downstairs, and E.E. and Northerner went upstairs to the main level of the house.

When E.E. was eight, she was playing with her cousins in a small pool in the front lawn of the Northerner's house. The pool was above-ground, approximately three feet high, and inflatable. E.E. left the pool to go inside the house to use the bathroom. Northerner stopped E.E. while she was inside and instructed her to sit on a couch. He then shut the blinds on the window facing out into the front yard. Northerner stood in front of E.E. and pulled down his pants. He pulled down E.E.'s swimsuit and inserted his penis into her vagina. Northerner then told E.E., "Put your mouth on my penis." (*Id.* at 104.)[5]

---

[5] E.E.'s testimony at trial does not indicate whether she complied with this request.

[9] Later that same summer, E.E., N.A.N., N.I.N., and two friends were playing in the pool. E.E. got something in her eye. She left the pool and grabbed a towel near the side of the house. Northerner asked her to sit next to him on an outside bench near the front lawn, facing the pool. Northerner unzipped his pants and exposed his penis. He then asked E.E. to perform fellatio, and E.E. did so. While this was going on, the other girls were playing a "mermaid game" in the pool, which involved staying mostly underwater. (*Id.* at 107.)

[10] During Thanksgiving weekend 2016, E.E. stayed at Northerner's house from Thursday night until Sunday. On Sunday, Northerner took E.E. back to Strong's house. During the ride, Northerner unzipped his pants and exposed his penis. He asked E.E. to per her mouth on his penis, and she did so. Also, during the car ride, Northerner inserted his fingers into E.E.'s vagina. E.E. felt Northerner's fingers move around in her vagina. Northerner directed E.E. not to tell anyone about what happened in the car. Strong noticed E.E.'s return was irregular in that Northerner returned E.E. to her home later than usual and Northerner did not walk E.E. to the door, as was his routine. Later that evening, E.E. told Strong that her vagina hurt.

[11] E.E. went to visit her Aunt Norma and Uncle Chris the following weekend. Uncle Chris is the brother of E.E.'s father. During the visit, E.E. told her cousin S.A.E. that she was bleeding. S.A.E. gave E.E. a pad. Norma was away from the house when this conversation between S.A.E. and E.E. happened, but S.A.E. relayed the conversation to Norma when she returned to the house. Norma was concerned because E.E. was only nine years old at the

time and too young to have started having her period. Norma then talked to E.E. privately. E.E. told Norma she had something she wanted to say, but E.E. wanted to wait until after her basketball game. After the game, Norma and Chris took E.E. home with them, and E.E. described what Northerner had done to her. Norma called the police, and E.E. spoke with Officer Justin Gray of the Indianapolis Metropolitan Police Department. Dr. Shannon Thompson later examined E.E. at Riley Children's Hospital and diagnosed E.E. with a history of sexual abuse. E.E. did not display any physical signs of sexual abuse during the exam.

[12] The State charged Northerner with one count of Class A felony child molesting for acts against S.M.M. For acts against E.E., the State charged Northerner with two counts of Level 1 felony child molesting; three counts of Level 4 felony child molesting; and one count each of Class A felony child molesting; Class C felony child molesting; Level 5 felony criminal confinement;[6] and Level 6 felony strangulation.[7] The court held a jury trial from June 3 to June 5, 2019. The jury returned verdicts of not guilty of criminal confinement, strangulation, and one count of Level 4 felony child molesting.[8] The jury returned verdicts of

---

[6] Ind. Code § 35-42-3-3.

[7] Ind. Code § 35-42-2-9.

[8] This count concerned an allegation that Northerner exposed himself and directed E.E. to perform oral sex on him while he was driving.

guilty on all remaining counts. The trial court sentenced Northerner to an aggregate term of seventy years.

# Discussion and Decision

## 1. Dr. Thompson's Testimony

[13] Northerner argues Dr. Thompson impermissibly testified as to the truthfulness of E.E.'s allegations, which he contends amounts to fundamental error. We generally review a trial court's decision on the admission or exclusion of evidence for an abuse of discretion. *Hill v. State*, 51 N.E.3d 446, 450 (Ind. Ct. App. 2016). A trial court abuses its discretion if the decision "is clearly erroneous and against the logic and effect of the facts and circumstances before it." *Id*. A party waives a claim of error on appeal by not objecting at the trial court level. *Quiroz v. State*, 963 N.E.2d 37, 42 (Ind. Ct. App. 2012), *trans. denied*. Nonetheless, a party may still advance a procedurally defaulted claim on direct appeal if the error amounts to fundamental error. *Jewell v. State*, 887 N.E.2d 939, 942 (Ind. 2008). However,

> fundamental error is extremely narrow and available only when the record reveals a clearly blatant violation of basic and elementary principles, where the harm or potential for harm cannot be denied, and which violation is so prejudicial to the rights of the defendant as to make a fair trial impossible.

*Id*.

[14] Indiana Evidence Rule 704(b) states: "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." This rule protects the fact-finding function of the jury. "The jury, not the witness, is responsible for deciding the ultimate issues in a trial, and opinion testimony concerning guilt 'invades the province of the jury in determining what weight to place on a witness' testimony.'" *Williams v. State*, 43 N.E.3d 578, 581 (Ind. 2015) (quoting *Blanchard v. State*, 803 N.E.2d 14, 34 (Ind. Ct. App. 2004)).

[15] Northerner argues Dr. Thompson impermissibly testified as to the truth of E.E.'s allegations in response to a juror's question.

> [Court:] I think this is a process question. Abuse is reported, you get the—you do the physical exam and it's—it's a normal finding. How do you come up with a—a diagnosis of abuse?
>
> [Dr. Thompson:] So the way we come up with a diagnosis is the totality of the allegations, because we know so much about sexual abuse and physical exams and the findings that are there and how children can act and not act, this—the history is the single most important part of that. So an accurate allegation or history provided for sexual abuse is the main way that diagnosis is made and that child is treated accordingly.

(Tr. Vol. III at 50.) Northerner contends that Dr. Thompson's diagnosis of a history of sexual abuse amounts to an opinion that E.E.'s allegations were credible.

[16]  The following exchange occurred before the jury was given the opportunity to ask questions, during Northerner's counsel's cross-examination of Dr. Thompson:

> [Counsel:] You made your diagnosis that she had been molested because she told you she'd been—she said she'd been molested, right?
>
> [Dr. Thompson:] I made my diagnosis based on the history that was provided about her allegation.
>
> [Counsel:] Right.  The history provided about her allegation was that she told people she had been molested, right?
>
> [Dr. Thompson:] That she had a forensic—forensic history— exam and she gave disclosure to her family, yes.
>
> [Counsel:] Just so we're clear, forensic history is her telling somebody that it happened?
>
> [Dr. Thompson:] Correct.

(*Id*. at 43.)  Thus, Dr. Thompson testified that her diagnosis of E.E.'s history of sexual abuse was based on E.E.'s self-report.

[17]  The juror's question regarding how Dr. Thompson typically diagnosed a history of sexual abuse allowed Dr. Thompson to explain that such diagnoses were typically based on the victim's self-report.  In fact, Northerner's counsel attempted to cast doubt on the reliability of Dr. Thompson's diagnosis during closing argument.  (*See id*. at 126 ("In this case, [Dr. Thompson] did a physical

exam—there's no evidence of abuse. None. Her conclusion? There was abuse. Why? 'Cause the girl said she was abused. That's not much of system if you ask me, but that's the way they do it.").) Dr. Thompson's testimony regarding the process for making her diagnosis of E.E did not encroach on the jury's fact-finding function. She did not testify that she believed E.E. In fact, she illustrated that a diagnosis of sexual abuse is based largely on the patient's self-report rather than an objective evaluation of the credibility of the patient's claims. Therefore, we hold Dr. Thompson did not give improper opinion testimony. *See State v. Velasquez*, 944 N.E.2d 34, 46 (Ind. Ct. App. 2011) (holding psychologist's testimony that child victim exhibited behaviors consistent with post-traumatic stress disorder did not constitute impermissible vouching testimony), *trans. granted, opinion vacated, order vacated, trans. denied*.

## 2. Northerner's Motion for Mistrial

[18] Northerner argues he did not receive a fair trial because the State asked questions that he believes implied he began a sexual relationship with his wife, Aumanda, while she was still underage. Northerner testified that he was fifty-five years old at the time of trial and that he lived in a house on Tade Lane with his wife and two daughters. On cross-examination, the State asked Northerner, "when your wife moved in with you, did she move into that address at Tade Lane or did she move into the other houses that you discussed?" (Tr. Vol. III at 87.) Northerner's counsel objected, and the court held a bench conference. Northerner's counsel raised a concern that the State was preparing to ask Northerner how old his wife was when she started dating him. The court ruled

that asking which house Aumanda moved into when she first started living with Northerner was permissible, but the court directed the State to "stay away from how old she is." (*Id*. at 89.) Following the bench conference, the following exchange occurred:

[State:] And, sir, when she moved in with—with you, was that to the address on Tade Lane or was that somewhere else?

[Northerner:] She—when she moved in with me, yes, I was living on Tade Lane.

[State:] And approximately when was that?

[Northerner:] I'm thinking, like, 15 years ago.

[State:] Okay. And you knew your wife for quite a while before that; is that correct?

[Northerner's Counsel:] Objection, Your Honor.

[Court:] Sustained.

[State:] Judge, I asked if he knew her before she moved in. How is that—

[Court:] Well, I'm hopin' that he knew her before she moved in, but—

[State:] As do I.

[Court:] –you're not—but we're not—but we're not gonna go there.

[State:] How old was your wife when you met her?

[Northerner's Counsel:] Objection, Your Honor.

[Court:] Sustained.

[State:] Let's back up. How old is your wife right now?

[Northerner's Counsel:] Your Honor—

[Court:] Sustained.

(*Id*. at 89-90.) In a hearing outside the presence of the jury, Northerner moved for a mistrial, and the trial court denied his motion. The court explained, "Well, the jury has been instructed that questions are not evidence, only answers of—[sic] evidence. They've heard no answers." (*Id*. at 91.) Further, the court stated, "I don't think your client's been put in a position of grave peril." (*Id*.)

[19] A mistrial is an extreme remedy meant to be granted only when no other relief can adequately correct an error. *Mickens v. State*, 742 N.E.2d 927, 929 (Ind. 2001). "Whether to grant or deny a motion for a mistrial is a decision left to the sound discretion of the trial court. We will reverse the trial court's ruling only upon an abuse of that discretion." *Stokes v. State*, 919 N.E.2d 1240, 1243 (Ind. Ct. App. 2010) (internal citation omitted), *trans. denied*. "In determining

whether a mistrial was warranted, we consider whether the defendant 'was placed in a position of grave peril to which he should not have been subjected.' The gravity of the peril is determined by 'the probable persuasive effect on the jury's decision.'" *Brooks v. State*, 934 N.E.2d 1234, 1243 (Ind. Ct. App. 2010) (quoting *Leach v. State*, 699 N.E.2d 641, 644 (Ind. 1998)), *reh'g denied*, *trans. denied*.

[20] Northerner argues the State's questions amount to an "evidentiary harpoon" meant to insinuate he had sexual relations with Aumanda when she was underage and before they were married. (Appellant's Br. at 29.) An evidentiary harpoon can be so damaging as to require a mistrial. *Roberts v. State*, 712 N.E.2d 23, 34 (Ind. Ct. App. 1999), *trans. denied*. "An evidentiary harpoon is the placing of inadmissible evidence before the jury so as to prejudice the jurors against the defendant." *Perez v. State*, 728 N.E.2d 234, 237 (Ind. Ct. App. 2000), *trans. denied*. The defendant must demonstrate "1) the prosecution acted deliberately to prejudice the jury and 2) the evidence was inadmissible." *Jewell v. State*, 672 N.E.2d 417, 424 (Ind. Ct. App. 1996), *trans. denied*. The defendant is not required to show that he would not have been convicted absent the evidentiary harpoon. *Id*. Rather, he "need only show that he was placed in a position of grave peril to which he should not have been subjected." *Id.*

[21] Northerner contends the State acted deliberately to prejudice him by repeatedly asking questions related to Aumanda's age after the court directed the deputy prosecutor not to do so. Northerner argues the State's questions about Aumanda's age insinuated to the jury that Northerner committed prior acts of

molestation. We do not condone the State's decision to ask Northerner questions about how old his wife was when he met her, how old his wife was at the time of trial, and how long Northerner knew his wife before she moved in with him after the trial court explicitly directed the State not to ask about Aumanda's age. These questions brought unnecessary attention to the age disparity between Northerner and his wife.

[22] Nonetheless, the jury did not hear answers to the State's questions about Aumanda's age. It is entirely speculative to conclude that the jury deduced from the State's questions that she and Northerner started dating when she was underage. *See Rose v. State*, 36 N.E.3d 1055, 1060 (Ind. Ct. App. 2015) (noting a purely speculative argument does not serve as a basis for reversal). Therefore, we hold the State's questions could not have had such a persuasive effect on the jury as to require a mistrial. *See DeBerry v. State*, 659 N.E.2d 665, 669 (Ind. Ct. App. 1995) (holding defendant was not subjected to grave peril by state trooper's testimony).

## 3. Prosecutorial Misconduct

[23] Northerner argues the deputy prosecutor committed prosecutorial misconduct by improperly vouching for the victims during closing argument and by making comments not supported by the evidence. A defendant must object at trial to a prosecutor's improper argument and request an admonishment in order to properly preserve a claim of prosecutorial misconduct. *Neville v. State*, 976 N.E.2d 1252, 1258 (Ind. Ct. App. 2012), *trans. denied*. If an admonishment is

not given or is insufficient, then the defendant must move for a mistrial. *Id*. We evaluate a properly preserved claim of prosecutorial misconduct by looking at "(1) whether misconduct occurred, and if so, (2) 'whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected' otherwise." *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014) (quoting *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006)), *reh'g denied*. However, if a defendant fails to object to alleged prosecutorial misconduct at the trial level, we will reverse only if the alleged misconduct amounts to fundamental error. *Gregory v. State*, 885 N.E.2d 697, 706 (Ind. Ct. App. 2008), *trans. denied*. Northerner did not object during the State's closing argument, but he argues on appeal that the deputy prosecutor's comments constitute fundamental error.

[24] Northerner argues the deputy prosecutor improperly vouched for E.E.'s and S.M.M.'s credibility during closing argument. The deputy prosecutor commented that E.E. and S.M.M. "were able to give us details of adult sexual conduct. And the reason that that is important is because you can't lie about what you don't know about." (Tr. Vol. III at 113-14.) Further, the deputy prosecutor also noted that E.E. and S.M.M. would have to be "evil" to falsely accuse Northerner of molestation and stick with their stories for years despite being questioned by multiple people multiple times about the allegations. (*Id.* at 132.)

[25] We look to caselaw and the Code of Professional Responsibility to determine if misconduct occurred. *Bassett v. State*, 895 N.E.2d 1202, 1208 (Ind. 2008), *cert.*

*denied* 556 U.S. 1171 (2009). "In arguments to the jury, a prosecutor can state and discuss the evidence and reasonable inferences that can be derived therefrom so long as there is no implication of personal knowledge that is independent of the evidence." *Emerson v. State*, 952 N.E.2d 832, 837 (Ind. Ct. App. 2011), *trans. denied*. This includes commenting on a witness' credibility if the assertions are supported by the evidence. *Neville*, 976 N.E.2d at 1260. In the comments above, the deputy prosecutor did not assert independent knowledge of the truthfulness of E.E. or S.M.M. Her comments were logical conclusions drawn from the evidence. *Ryan v. State*, 9 N.E.3d at 671 (holding it was not prosecutorial misconduct for deputy prosecutor to assert the victim was telling the truth when evidence suggested she was being honest), *reh'g denied*.

[26]    Additionally, Northerner contends the State asserted facts not in evidence during closing argument. The deputy prosecutor argued that Northerner molested E.E. more times than he molested S.M.M. because E.E.'s medical problems made her vulnerable and less believable. Also, during closing argument, the deputy prosecutor commented, "[a]nd I would note for you that this first incident with EE and the only incident that we have with SMM, both involved alcohol or I guess we could say a little liquid courage on the part of the defendant." (*Id.* at 111.)[9] Further, the deputy prosecutor asserted that Northerner molested E.E. and S.M.M. even though his children were sleeping

---

[9] "Liquid courage" is an idiom referring to the "decrease in timidity or inhibition that comes from imbibing alcoholic beverages." *Liquid courage*, <u>Farlex Dictionary of Idioms</u> (2015). https://idioms.thefreedictionary.com/liquid+courage **[https://perma.cc/MCB7-5SRA]**

in the same room because he knew his children were deep sleepers. While there was no direct testimony of Northerner's knowledge of his daughters' sleep habits or why he had beer during two of the incidents, all the deputy prosecutor's comments comport with common sense. A criminal may logically choose a victim that minimizes the chance of resistance or risk of getting caught. A father likely understands how well his children sleep, and it is not uncommon for someone to engage in risky behavior after consuming alcohol. Therefore, we hold the State's comments during closing argument did not constitute misconduct, let alone fundamental error. *See Ramsey v. State*, 853 N.E.2d 491, 501 (Ind. Ct. App. 2006) (holding comment made during closing argument was permissible comment on the evidence and not prosecutorial misconduct), *trans. denied*.

## 4. Sufficiency of the Evidence

[27] Northerner contends the State presented insufficient evidence to sustain his convictions. In assessing whether there was sufficient evidence to support a conviction, we consider the probative evidence in the light most favorable to the verdict. *Burns v. State*, 91 N.E.3d 635, 641 (Ind. Ct. App. 2018). "It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction." *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). "Reversal is appropriate only when no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. Thus, the evidence is not required to overcome every reasonable hypothesis of innocence and is sufficient if an inference may

reasonably be drawn from it to support the verdict." *Burns*, 91 N.E.3d at 641 (internal citation omitted).

[28] A person commits child molesting as a Level 1 felony if the person is older than twenty-one years of age, and with a child less than fourteen years of age, "knowingly or intentionally performs or submits to sexual intercourse or other sexual conduct[.]" Ind. Code § 35-42-4-3(a) (2014). "Other sexual conduct" is defined as "an act involving: (1) a sex organ of one (1) person and the mouth or anus of another person; or (2) the penetration of the sex organ or anus of a person by an object." Ind. Code § 35-31.5-2-221.5 (2014). If the act was committed prior to July 1, 2014, the conduct constitutes a Class A felony. Ind. Code § 35-42-4-3(a) (2007).[10] A person commits child molesting as a Level 4 felony if the person "with a child under fourteen (14) years of age, performs or submits to any fondling or touching, of either the child or the older person, with intent to arouse or to satisfy the sexual desires of either the child or the older person[.]" Ind. Code § 35-42-4-3(b) (2014). If the fondling or touching occurred prior to July 1, 2014, the conduct constitutes a Class C felony. Ind. Code § 35-42-4-3(b) (2007).

[29] Northerner argues the State should have been required to provide testimony to corroborate his victims' testimonies. However, we are bound to follow the

---

[10] Prior to July 1, 2014, Ind. Code § 35-42-4-3(a) referenced "deviate sexual conduct" rather than "other sexual conduct." *Compare* Ind. Code § 35-42-4-3(a) (2014) *with* Ind. Code § 35-42-4-3(a) (2007). However, "deviate sexual conduct" and "other sexual conduct" refer to the same conduct. *Compare* Ind. Code § 35-31.5-2-94 (2012) (repealed 2014) *with* Ind. Code § 35-31.5-2-221.5 (2014).

decisions of our Indiana Supreme Court. *See Dragon v. State*, 774 N.E.2d 103, 107 (Ind. Ct. App. 2002) ("Supreme court precedent is binding upon us until it is changed either by that court or by legislative enactment."), *trans. denied*. Our Indiana Supreme Court has explained that "[a] molested child's uncorroborated testimony is sufficient to sustain a conviction." *Carter v. State*, 754 N.E.2d 877, 880 (Ind. 2001), *reh'g denied*. Therefore, we will follow our Supreme Court's directive and not impose a corroboration requirement.

[30] Northerner asserts E.E.'s and S.M.M.'s descriptions of being molested by him "run counter to human experience and basic common sense." (Appellant's Br. at 22.) Northerner testified he never touched either E.E. or S.M.M. inappropriately, and he denied ever having intercourse with E.E. However, it is the province of the jury to weigh the conflicting evidence and to assess what to believe. *See Scott v. State*, 867 N.E.2d 690, 694 (Ind. Ct. App. 2007) ("We must respect the jury's exclusive province to weigh conflicting evidence[.]"), *trans. denied*.

[31] S.M.M. testified that Northerner molested her, and E.E. testified that Northerner molested her multiple times under several different circumstances. A reasonable juror could believe that a sex offender would molest a child even though other people are close by, especially if the other people are asleep, in another room, or distracted. *See Leyva v. State*, 971 N.E.2d 699, 702 (Ind. Ct. App. 2012) (holding child's testimony that defendant molested her while others were sleeping in the same room was not incredibly dubious and sufficient evidence supported defendant's conviction), *trans. denied*. Sufficient evidence

supports Northerner's convictions, and we will not reweigh the evidence or assess witness credibility. *See Drane*, 867 N.E.2d at 148 (holding sufficient evidence supported convictions for rape and murder even though defendant testified he did not commit the crimes).

# Conclusion

[32] The trial court did not abuse its discretion when it admitted Dr. Thompson's testimony because it was not improper opinion testimony. Further, the trial court did not abuse its discretion in denying Northerner's motion for a mistrial, and the deputy prosecutor did not commit misconduct during closing argument. Given current Indiana Supreme Court precedent, we will not impose an additional corroboration requirement in cases involving abuse of a minor. Therefore, we affirm.

[33] Affirmed.

Crone, J., and Pyle, J., concur.